IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

DANIEL D. DILLARD, §

§ Plaintiff,

v. § Civil Action No. 7:19-cv-81-M

§ Case No. 22-10791 **FILED**

**January 18, 2024**

LORIE DAVIS, et al., § KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

defendants'. §

---

PLAINTIFF'S DECLARATION IN SUPPORT OF
MEMORANDUM OF LAW IN SUPPORT OF TRO

---

Plaintiff Daniel D. Dillard declares:

1. I am the Plaintiff in this case. I make this declaration in support of my motion for a temporary restraining order and a preliminary injunction to ensure that I receive necessary medical care and due process; and to enjoin Bobby Lumpkin and/or his agents from holding me under conditions of confinement that the Courts have deemed unconstitutional.

2. As set forth in the Plaintiff's Amended Compliant (ECF No. 86 - Incorporated by Reference) in this case, I am being subjected to retaliatory actions from TDCJ-CID Bobby Lumpkin and/or his agents here on the Michael Prison. I was assaulted by prison staff on November 9th, 2023. See Exhibit A

3. During the assault, one of the defendants' agent (Name Unknown - NU) tried to gouge out my left eye, one of them (NU) attacked my genital area, one of them stuck their finger in my anal cavatity, Sergeant Obadina S. Omoaka participated in the assault and Lieutenant Daniel A. Lakin initiated the assault after I wrote an administrative grievance.

4. TDCJ has a Behavioral Intervention Plan - 2022 - (BIP) and it defines this assault as an aggravated use of force and unnecessary.

5. The BIP demanded that Omoaka and Lakin be

2

removed from the response team because they had previously been hostile towards me for filing administrative grievances concerning their poor work ethic and over-all unprofessionalism. The administrative grievances were never processed by Lakins' wife, Mica G. Lakin, who is the Michael Prison Grievance Supervisor-Investigator III. see Exhibit A and B

6. Before the assault, Lakin, D. screamed that he didnot care about my grievances because his wife was the supervisor and would take care of them. see Exhibits A and B, C.

7. The BIP specifically states," The use of force to intimidate, coerce, punish, or for the purpose of revenge is prohibited." Daniel A. Lakin has a direct connection to this instant suit by way of defendants' Jimmy Smith, Elbert Holmes, Andrea Lozada, Cody Miller, and the rest of the Allred prison defendants.

3

8. The BIP specifically states that, "Only pressure point or joint manipulation techniques taught by the Training and Leader Development Division shall be used." It goes on to declare that, "Security Staff shall "Avoid blows to vital areas, such as the 1) Head; 2) Kidney Area; 3) Liver area; or Genital area." The assaultant purposely targeted these areas, especially my head and genital area.

9. Daniel A. Lakin used high concentration CS pepper spray in high volumes, which can be lethal when left on for a long time. I was NOT afforded the opportunity to decontaminate, neither was I allowed a shower until November 14th, 2023... some five days later.

10. I was not afforded a BIP-2 Inmate Participant Statement form ~~wasn't provided to me~~, and they didnot pass them to other inmate witnesses.

11. After the assault, I was frog marched

4

through the 12 building hallway, handcuffed and shackled. The restraints were so tight that I now have permenanent scars around my wrist and ankles.

12. I was arbitrarily placed on security observation status - "SOS", where my outer clothes including my personal gym shorts were cut off my body.

13. I was placed face down with four officers on my back on a flooded feces covered floor. see Exhibit D.

14. The vision in my left eye is significantly degraded and I have been denied medical treatment even though I specifically vocalized my injuries during the recorded assault.

15. The defendants' agents (Veronica B. Lilly, Veraton B. Mitchell, Jr., and Erik L. Brannan) are currently holding me in a part of the prison where my movement is

extremely restricted. I have to endure fires and smoke inhalation daily. The level II and III inmates besides and around me flood the runs with feces and toilet water daily. Prison personnel collectively punish me because one or two other inmates throw feces to get the things TDCJ is suppose to provide, such as recreation, showers, food, necessities, etc.. Yesterday, January 10, 2023, is just one such day. I was left in shower from 8:17 to 9:30 A.M., while officers refused to do their rounds. See Exhibit E

16. On November 9th, 2023, after the aggravated use of unnecessary force, I was left in E-Pod 13 cell. As stated before the cell was smeared top to bottom - wall to wall with human feces, blood and other fluids.

17. I was NOT given any cleaning supplies, neither did prison staff allow anyone to clean the cell.

18. The lights were kept on 24-hours a days.

6

19. The air was turned up to freeze to death.

20. The water was turned off and there was s\*\*t stuffed and caked in and around the sink and water faucet.

21. The perforated screen on the door was covered in human waste and I was only given water through the screen with a plastic water bottle that was used on me and the other six human beings (All naked) on 2-row 1-section 12 building E-pod. see Exhibit A

22. Despite visible open wounds on my face and head, ~~especially~~ especially around my gouged left eye, I was made to stand in feces water, up to my toes or lay down on the cold steel bunk.

23. I had no way to protect myself from the cold air or cold water so I was forced to pace back and forth through waste water in order to warm myself.

24. The cuts on the bottom of my feet began to

turn colors and extude pus by the third day.

25. I was only fed 1 spoiled baloney and 1 Peanut butter sandwich at meal times. Breakfast, lunch and dinner.

26. I was kept under these conditions for four days.

27. I was NOT given showers/recreation during this time, nor was I given hygiene materials.

28. Since then I have been moved to 12 building F. Pod where level II's and III's are housed even though I am a level one. See Exhibit F

29. This is the pod where inmate litigator Todrick Morris was hit in the head with a fan motor for his litigation activities, while prison staff looked on and did nothing to prevent the assault.

30. On November 13th, 2023, some of my personal property was brought to me. My property was intentionally soaked in pepper spray and trampled, especially my legal material. See Exhibit G

8

31. My typewriter was totally destroyed and confiscated.

32. 92 of my family pictures were soaked to some degree in pepper spray and coffee. I did not own any coffee.

33. The remaining property was placed in F-Pod 40-cell with me. The cell was contaminated with feces just like E-Pod 13 cell.

34. I was NOT given cleaning supplies to clean this cell, But every Thursday Michael Prison provides inmates with four bars of green soap for showering. I had to forgo showering to use the soap to clean as best I could. see Exhibit I

35. I am perpetually indigent and I dont have the means to purchase cleaning material from commissary. see Exhibit J

36. I still have not received any justification for the use of force, nor have I given these prison

9

staff any justification to use force against me. The use of force was not a necessary or reasonable part of keeping order.

37. I did file an administrative grievance on this issue. The response was this is NOT a grievable issue. see Exhibit C

Pursuant to § 1746, I declare under penalty of perjury that the foregoing is true and correct.

January 11th, 2024

Respectfully submitted,
X Daniel D. Dillard
Daniel D. Dillard #01400285
Mark W. Michael Prison
2664 F.M. 2054
Tennessee Colony, Texas 75886

10

EXHIBIT- A

In the United States District Court for the

Northern District of Texas, Wichita Falls Division

Daniel D. Dillard
                    plaintiff,

        V.

Lorie Davis, et al
                    defendants,

| Civil Action No. 7:19-CV-081-M
| Case No. 22-10791

## DECLARATION OF JAMES ANTHONY JACKSON

James A. Jackson hereby declare:

1. That I am the Declarant making this statement.

2. That I am over 18 yrs and competent to testify in court to the facts stated herein.

3. That I was housed on C-Pod #2 section cell #25 at the same time Daniel Dillard was housed on C-Pod #2 section cell #15.

4. That I personally witnessed the events that took place on November 9th, 2023 on C-Pod Micheals Unit Restrictive Housing involving Mr. Dillard and Correctional Staff.

5. That I have been incarcerated at Micheals Unit since April 15th, 2021 and I was housed in cell #25 C-Pod #2 section when the events described herein took place.

6. That my cell was located on two row and to the right of Mr. Dillard's cell and therefore I could hear and see when Officers responded to Mr. Dillard's cell for I.C.S. by coming thru the front door of two section.

1 of 3

7. That on Nov. 2013 I witnessed Capt. Paquinam,
Sgt. Daniel B. Manyango, Sgt. Obadina S. Omoaka, and Sgt. Oluyemi
Akinode approach Mr. Dillard's cell and a few seconds later I heard
loud voices yelling and then I heard Mr. Dillard scream for help.

8. That I heard Lt. Lakin say to Mr. Dillard, "I dont give a damn
about you writing another grievance because my wife is the
Supervisor over the Grievance System." "What do you think is going
to happen to your grievances."

9. That after this exchange, Lt. Lakin called for a 5 man use of
force team to extract Mr. Dillard from the cell. I dont know why Mr.
Dillard was extracted from his cell but I never witnessed anyone
from the Psyche Dept. Mental Health, Self Harm Staff, or Lt.
Lakin attempt to calm down the situation.

10. That when the use of force Team entered the cell of Mr. Dillard
I heard him scream continually, "Stop hitting me I am not resisting"
I could also hear the thud of heavy blows hitting Mr. Dillard's flesh
while he yelled, "Somebody help me."

11. That Mr. Dillard was eventually bought out the cell in handcuffs
and I could see tears coming from his face.

12. That the use of force I witnessed does not conform to TDCJ
Use of Force plan.

13. That Mr. Dillard was escorted off two section and taken to E-Pod
to be placed on "Security Obseration Status".

14. That "SOS" is being abused by SOS Manager Sgt. Rutledge who
allow inmates to be placed on SOS naked inside filthy dirty
cells (having feces, urine, and food mold on floor, walls) that are
freezing cold around 55 degrees.

5. That I myself was placed on SOS on 12-14-23 for refusing to go into a cell whose Air System did not work. Therefore I have personal experience of what occurs on Security Observation Status.


Further, Declarant sayeth naught...


## DECLARATION

I, James Jackson, hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of January, 2024.


Address of Declarant

James Jackson
DCJ # 1883042
Michaels Unit
564 FM 2054
Tenn. Colony, TX. 75886


*James Jackson*
Signature of Declarant

3 of 3

Step #6 Grievance

## The Facts

On 12-14 I was moved from E-55 cell to E-49 by Off. Baxter when I arrived at the cell asked Baxter to let me check the air vent to see if it works bc last time (12-26-21 to 4-15-22) I was in the cell the air system did not work b/c there was no air tobe connected to the vent. I went into the cell and looked into the vent and the same problem existed. I told Baxter and he called Sgt Crosby I explained to him that the air system does not work no heat comes into the cell. Sgt Crosby checked it out himself and said you are right but I cant move you to another cell I'll have to call Lt. Fouts, Sgt Crosby called Fouts and when Fouts arrived I explained to him the situation and Sgt Crosby confirmed what I said. Lt Fouts then refused to move me and I refused to be housed in the cell therefore Lt Fouts then said I'm placing you on "Security Observation Status" for refusing housing. I was then escorted to E-2 cell for SOS and Sgt Crosby took all my clothes and shoes and left me in the cell naked.

The SOS cell was freezing cold and filthy with blood stains and feces stains on the floor and walls from someone who was previously housed there. I remained on SOS from 12-14 to 12-20.

My complaint is that Lt Fouts abused his authority by placing me on SOS for refusing to go into a cell whose utility was inoperable which is not the proper action for refusing housing. Lt Fouts imposed a disciplinary sanction upon me without due process and he does not have the authority to use SOS as a punishment which is a violation of TDCJ policy. Sgt Rutledge is responsible for management of SOS and she is allowing inmates to be placed on SOS naked, in filthy cells, that are freezing cold, and beyond the 72 hr housing limitation set by TDCJ policy. The actions of Lt. Fouts, Sgt. Crosby, and Sgt. Rutledge violate SOS Policy and my constitutional rights. They are abusing SOS in violation of TDCJ SOS Policy.

## Relief

Make these individuals stop abusing SOS by using it as punishment and subjecting inmates to inhumane living conditions

# STATEMENT OF FACTS

I am an inmate from the Maryland Prison System sent to TDCJ for housing under the Interstate Corrections Compact. My experience on Restrictive Housing has been the worst experience I've had in any lockdown environment I've been in and I've been in many across the United States from State and Federal Prisons.

Restrictive Housing is a super stressful environment that attacks the mental and emotional stability of the inmates housed there which forces inmates to restort to drugs (caffeine/coffee, dope, alcohol, pills, etc.) to neutralize the impact of the stress hormones that causes daily discomfort. The stress of the environment creates a mental and emotional state of anxiety and each individual is just trying to restore the state of relaxation that the mind and body requires in order to function.

The first issue that needs to be addressed is the "I dont care about inmates attitude" of the staff especially the Management Staff. This attitude does not recognize the fact that inmates are Human Beings who deserve humane treatment. This attitude is expressed in the daily dereliction of duties and total disregard of TDCJ policies designed to recognize the Human rights and the constitutional rights of the inmates.

For example, the air system is so cold in winter season that the cells are in the 50's and 60's (while it's in the 50's and 60's outside). Why would cold air be on in winter instead of heat? The cold cell causes stress on the mind because of the discomfort imposed on the body by cold cell temperature. This stress causes an emotional reaction of anxiety and frustation because inmates don't control the cell temperature.

Another stress generator is the inconsistency of daily showers and recreation caused either by staff shortage or Officers lying to inmates saying that the Rank told them there are no showers nor recreation today. Excessive confinement to cells without regular social interaction is a stress generator causing stress hormone to create mental and emotional anxiety, frustation, etc. leading to the use of drugs to try to restore the state of relaxation that the body and mind needs to function as healthy instruments.

Inmates have no recourse to address the issues that affect Restrictive Housing because the Management Personnel do not care about inmate welfare therefore grievances, informal complaints, protests, etc. fall on deaf ears which makes the inmates feel helpless because there is no one to turn to for redress.

2 of 3

As a result of this neglect a variety of inmate behaviors are produced such as inmate suicides, inmate drug addictions, unruly behavior by inmates expressed thru staff assaults, etc. Every inmate's response is different depending on their personality make up.

The final stress generator is the prolonged housing of inmates within Restrictive Housing who are labeled as "STG" (Security Threat Group). These inmates are held here indefinitely because of membership in Inmate Organizations therefore these inmates are subjected to this inhumane treatment for decades which makes them become suffers of "Post Traumatic Stress Syndrome". Upon release from Restrictive Housing they are never the same person. This is my statement because this has been my experience in Restrictive Housing where I've been for the past 18 months.

executed this 7th day of March, 2023.

James Jackson
TDCJ # 1883042                           _James Jackson_
Micheals Unit
2664 FM 2054
Tenn. Colony, TX. 75886

3 of 3

12 E 10

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## Inter-Office Communication
## Administrative Review and Risk Management
## Inmate Grievance

---

**TO: JACKSON,JAMES ANTHONY**

**TDCJ #: 01883042**

**UNIT: MI**

**FROM:** Central Grievance Office                          **SUBJECT:** Correspondence

---

Your documents received in this office have been reviewed and a response is indicated below.  Contact the warden, major, chief of classification or a security officer for issues you deem as an emergency; however, are not considered an emergency, through the Inmate Grievance Procedure. **If you need additional information or assistance, you may contact the Unit Grievance Investigator at your unit.**

 

- ☒ **Your correspondence was received at the Central Grievance Office.**

- ☐ Your correspondence was forwarded to this office by the **Ombudsman's Office.** That office does not respond to inmate complaints or requests.

- ☒ Please utilize the Inmate Grievance Procedure to address your concerns.

- ☐ A copy of the Instructions on How to Write and Submit Grievances is enclosed for your information.

- ☐ Your Step 1 grievance(s) was properly screened.

- ☐ Direct this issue to the Classification and Records Office.

- ☐ Direct this issue to the Parole Board.

- ☐ It is not permissible to mail your grievances directly to the Central Grievance Office. Submitting your grievances incorrectly may result in your grievable time to expire.

- ☐ This issue is currently being addressed by unit officials. Grievance # _____ is under review at Step _____.

- ☐ These issues have been reviewed at both steps of the grievance procedure. No other administrative remedies are available to you regarding the issue. Further action by this office is not warranted.

- ☐ Records indicate that Grievance # _____ was returned to you on _____.

- ☐ If you wish to obtain a copy of a Step 1 grievance, contact your Unit Grievance Investigator via I-60 Request to Authority.  The records retention for grievances is three years.

See Reverse Side

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

| FROM: Central Grievance Office | SUBJECT: Inmate Correspondence |

**You should always attempt to resolve your problem informally at your unit with staff, department and security supervisors, or the warden. Verbally communicate the problem, or submit an I-60 Inmate Request to Official. Sending your concerns to the wrong department or agency is inappropriate and only delays valuable response time. Your prison-related issues can be addressed in a timely manner by directing them to the appropriate responsible TDCJ department listed below.**

☐ **Inmate Protection Issues (OPI):** Immediately contact a correctional officer; security supervisor; warden; assistant warden; or the Classification Department at your unit.

☒ **Inmate Grievance Procedure:** Issues regarding unit operations, disciplinary disputes, property issues, mail or any other matter relating to conditions of care or supervision may be formally addressed through the Inmate Grievance Procedure if informal contact (verbally or I-60) with unit staff does not address your concerns. Submit your Step 1 grievance to the Grievance Department at your unit. Allow ample time for the Grievance Department to investigate your complaint and return a reply to you. If you appeal a decision to the next level, you must submit a Step 2 grievance along with the original answered Step 1 grievance to the Grievance Department at your unit. Step 2 grievances are reviewed by the regional authority or the Central Grievance Office if you are dissatisfied with the response on the Step 1. **Directing grievances to unrelated offices may result in expiration of your grievable time period.**

If you have already pursued the issue through the Inmate Grievance Procedure at Step 1 and Step 2; no other administrative remedies are available to you regarding the issue. You may pursue the matter in any manner you choose outside of the agency.

☐ **Medical Care:** The unit physician is the primary care provider at the unit level and is responsible for the determination of medical treatments, medications, medical restrictions, and scheduling of services. You should attempt to resolve your problem at the unit level first by contacting the unit medical administrator in writing (sick call request or I-60 request form) for assistance. Subsequently, if you are not in agreement with the provider's response you may utilize the grievance process. You will not be transferred for medical reasons without the approval and recommendation of unit health care providers.

☐ **Office of Inspector General (OIG) Investigation:** Complaints or allegations relating to excessive or unreported use of force, physical harm by staff, or any crime committed by an inmate or employee on state property should be directed to the Office of Inspector General, Investigation Division at P.O. Box 4003, Huntsville, TX, 77342. Full details must be provided in order to initiate an investigation in this manner.

☐ **Classification:** Issues related to time disputes; time calculations; sentencing; concurrent time and stacked time; jail time; forfeited good conduct time; back dated good conduct time; class; promotions; cell assignment; or information on various programs should be directed to the Classification Chief at your unit or the Classification & Records Department at P.O. Box 99, Huntsville, TX, 77342-0099.

☐ **Transfer:** Inmates are not at liberty to choose their unit of assignment. Notify the Classification Department at your unit if you have a reason that warrants a transfer. A request for a hardship transfer may be made if an immediate family member, listed on your approved visitation list, is unable to travel long distances. To be considered, you must be at least L1/G3, with no major disciplinary cases for 1 year and more than 200 miles from home. The family member may submit their request along with a letter from their doctor to verify the medical disability to Joni White, TDCJ-Classifications & Records Department at P.O. Box 99; Huntsville, TX, 77342-0099. A transfer is not guaranteed, but the request will be reviewed for consideration.

☐ **Parole:** Parole review status issues should be directed to the Board of Pardons and Paroles at P.O. Box 13401, Capitol Station, Austin, TX 78711.

☐ **Education:** Issues related to education should be directed to the Windham School Principal at your unit. Continuing Education issues should be directed to Windham School at P.O. Box 40, Huntsville, TX, 77342. You will not be considered for educational transfer without Windham recommendation.

☐ **Trust Fund & Commissary:** Issues related to your commissary account should be directed to Inmate Trust Fund at P.O. Box 629, Huntsville, TX, 77342. Issues related to commissary purchases, items stocked, or special requests should be directed to the commissary supervisor at your unit.

☐ **Food Service:** Issues related to meals, sack lunches, or special diet menus should be sent to the food service manager for resolution at your unit. If the issue is not resolved at the unit level, then contact the Director of Food Service at P.O. Box 99, Huntsville, TX, 77342-0099

☐ **Legal Assistance:** Issues such as conviction appeal, detainers, divorce, or child support should be directed to an inmate's attorney or State Counsel for Offenders, Legal Services Section at P.O. Box 4005, Huntsville, TX, 77342-4005.

☐ **Law Library:** All inmate legal issues related to unit operations such as, access to courts; legal visits with other inmates; world attorney visits; indigent, legal or correspondence supplies; postage; policy; and state law information requests should be directed to the law library supervisor at your unit.

☐ **Security Threat Group (STG):** If you feel you have been incorrectly identified as a member of a security threat group, or wish to begin the disassociation process, you should contact the Security Threat Group Officer (STGO) at your unit. The STGO will know the proper procedure to follow in having your STG status reviewed. You may also write to the Security Threat Group Management Office (STGMO) at P.O. Box 99; Huntsville, TX, 77342-0099. However, the STG Management Office relies more on requests and information submitted to them by the Unit STGO than directly from inmates.

☐ **Lockdowns & Shakedowns:** Unfortunately, inmates who had nothing to do with a disturbance are often included in a lockdown, and all inmates at a unit are affected by a semi-annual shakedown. The procedures for implementing a lockdown or shakedown are well established and have proven effective in restoring order and ensuring the security of the unit, as well as the safety of inmates and staff. That does not mean the process is pleasant for inmates or staff

☐ **Laundry/Necessities/Unit Supply:** These items are available on a one for one exchange. You must turn in an item to receive a like item. Resolution must first be attempted on the unit for issues involving laundry/necessities and unit supply.

☐ **Rehabilitation Programs:** Questions regarding rehabilitation are to be directed to: Rehabilitation Program Division at 4616 W. Howard Ln.
Suite 200; Austin, TX 78728.

☐ **Religion:** Any issue related to religious programs; services; holidays; or activities should be directed through the Chaplain at your unit or the TDCJ Chaplaincy Department at P.O. Box 99, Huntsville, TX, 77342-0099.

See Reverse Side

December 6, 2021

From: James Jackson

TDCJ # 1883042

Micheals Unit

2664 FM 2054

Tenn.Colony, TX. 75886

To: Grievance Headquarters
Inmate Complaints Office
P.O. Box 99
Huntsville, Texas 77342

Re: Emergency Complaint regarding the breakdown of the Management System of 12 Building
Restrictive Housing at Michaels Unit.

## EMERGENCY COMPLAINT

This communication is an "Emergency Complaint" directed to your Office to resolve the crisis
taking place on Restrictive Housing at Michaels Unit.  There has been a breakdown of the
Management System of Restrictive Housing (formerly Known as Administration Segregation)
wherefore the management personnel have become derelict in their duties in total disregard of
TDCJ policies.

This behavior has created a negative atmosphere for the inmates housed on Restrictive Housing
which has caused a high stress level amongst many inmates of which some have chosen to commit
suicide to escape the pressure.  Other inmates have responded by becoming belligerent towards
staff because of the breakdown in the integrity of the Grievance system and Informal Complaints
which has become a "JOKE" that does not resolve problems but participates in the conspiracy to
sweep problems and complaints under the rug.

I am housed in 12 Building Restrictive Housing and I am filing this Emergency Complaint to bring
to your attention the following violations of TDCJ policies by the Management Staff which has
created unnecessary hardship for me and caused a violation of my constitutional rights not to be
subjected to "Cruel and Unusual Punishment" just because I am on Restrictive Housing.

DEC 2 1 2021

## BREAKDOWN OF MANAGEMENT SYSTEM

The Management System of Restrictive Housing has become totally dysfunctional because the Management Personnel have become derelict in their duties. This dereliction is a direct result of the failure of "Ranking Personnel" to supervise staff responsible for the management of the daily activities of Restrictive Housing. Officers ▬▬ are allowed to operate under their own rules in disregard of TDCJ polices. The Warden is also derelict in his duties because these issues have been brought to his attention through regular grievance procedures and informal complaints and he has chosen to ignore the crisis and continues to allow staff to run wild.

## BREAKDOWN OF GRIEVANCE INTEGRITY

The integrity of the Grievance system has become corrupt because it no longer operates to resolve problems and complaints. Many grievances are lost, some are never responded to, and others are not fully investigated to get the facts of the complaint. As a result, the Grievance system fails to provide a remedy to the issues and problems complained about. The Warden in his response never thoroughly addresses the issue complained about nor provides relief for the issues.

## VIOLATION OF INFORMAL COMPLAINT POLICY

Restrictive Housing Officers routinely refuse to call Ranking Staff to allow inmates to present their Informal Complaints to the Rank. Inmates are forced to use "Protest Tactics" (setting fires, jacking slots, dayrooms, etc.) to get the attention of Ranking Staff in order to present Informal Complaints. When the Rank arrives, they have an attitude of prejudice that does not address the issue but focuses only on punishing the inmate which deprives inmates of having a "Platform to Resolve" complaints. This behavior is a direct violation of TDCJ Informal Resolution Policy.

## VIOLATION OF COVID-19 POLICY

Restrictive Housing Officers fail to pass out bleach to allow Restrictive Housing inmates to sanitize our cells to kill germs related to the spread of COVID-19. Staff and inmates are also allowed to walk around 12 Building unmasked while sneezing and coughing germs everywhere.

## VIOLATION OF SANITATION POLICY

Restrictive Housing Officers fail to supervise SSI Inmates and make them clean the showers and sanitize the Housing Pod. Showers go unclean for months with fungi, bacteria, and germs growing on the walls, etc. No Cleanup Crew cleans the Pods.

## VIOLATION OF DUTY POST POLICY

Restrictive Housing Picket Officers and Floor Officers do not switch out duty posts but remain at the same post for the entire 12-hour shift. (Showing favoritism to female officers). This causes the Floor Officer to become exhausted and come up with lies not to continue showers and recreation to their completion. This behavior is a violation of TDCJ duty post policy for Pickets.

## VIOLATION OF RECREATION POLICY

Restrictive Housing Officers do not conduct daily recreation but instead make up lies about why Restrictive Housing inmates cannot receive daily recreation.  This behavior is a violation of TDCJ recreation policy and Texas Code that mandates that all Restrictive Housing inmates receive seven (7) to five (5) hours out of cell recreation weekly.

## VIOLATION OF PROPERTY POLICY

Restrictive Housing Property Officers and Population Property Officer routinely lose inmate property and withhold inmate legal property and level property without justification.  Inmates sit on Restrictive Housing the entire 90 days from level #3 to level #1 with no property.  This behavior is a direct violation of TDCJ Restrictive Housing Plan Policy.

## VIOLATION OF GROOMING POLICY

Restrictive Housing Officers do not provide Restrictive Housing inmates with razors during showers nor do they conduct haircuts so that Restrictive Housing inmates can maintain good personal hygiene.  They got everyone walking around with bears and afros or you have to jack the slot to see the Barber.  This behavior is a violation of TDCJ Grooming Policy (AD-03.83 and AD-03.50).

## VIOLATION OF DIETARY POLICY

Restrictive Housing Food Service Officers do not supervise Kitchen Workers preparing food trays for Restrictive Housing inmates and they allow Kitchen Workers to steal food off the trays which deprive Restrictive Housing inmates of the proper ration and calories that suppose to be on the trays.  This behavior is a violation of TDCJ Food Service Policy.

## VIOLATION OF LIVING STANDARDS POLICY

Restrictive Housing Officers fail to address complaints from Restrictive Housing inmates regarding cell dysfunctions such as toilet problems, light problems, no mattress, heat not working in cell, etc.  They disregard request from maintenance issues, etc.  The heat only works on one side of F-Pod and no one cares to address the problem.  This behavior is a violation of TDCJ policy governing living standards of Restrictive Housing inmates.

## REMEDY

I request the removal of all Ranking Staff from 12 Building Restrictive Housing and have them replace with Staff who are going to make sure Restrictive Housing Officers are doing their job. or make the Warden correct these problems.

James Jackson
Signature

DEC 2 1 2021

EXHIBIT- B

## AFFIDAVIT § IN THE STATE OF TEXAS
§ IN THE COUNTY OF ANDERSON

I am Reidie James Jackson #1164177, and am over (18) years old. I am fully capable of making this document and the statements herein, and do so willingly. The statements herein are true and correct to the best of my knowledge. The statements herein are from my personal knowledge; viz:

### I
### STATEMENTS

I am a citizen of Texas, Native-born on Galveston Island, Texas in Galveston County, Texas on September 2, 1977. The last four digits of my Social Security Number are 9153. I acquired a GED, welder's certification, a scuba-diver's certification, and several hours towards a college degree.

I have been incarcerated for (20) years (8) months and about (16) days on a state charge for Aggravated Robbery out of Matagorda County, Texas. I have been on several Texas Department of Criminal Justice-C.I.D. Units: Stiles, Clements, Ramsey 1, Wynne, Telford, and presently Michael Unit. I have learned all of the relative TDCJ-Rules, Regulations Policies, and Procedures (TDCJ-Rules). Further, I have also become a court litigator, learning and teaching what little I figure out to those when choose to try to learn their constitutional rights.

I have read the Plaintiff's complaint in the instant suit, and I truely believe his rights were violated during the time-periods she complained of prior to us meeting, and am positively sure that her protected rights are presently being violated as I have personally witnessed certain events over the last thirty-plus days.

When I arrived on Michael Unit on July 18, 2022 I was a victim of similar types of violations as those described in Plaintiff's Factual Allegations in her suit. There was at the time of my arrival, no Grievance Personnel assigned to the Michael Unit, with security staff ultra virely retrieving grievances from the "Drop Box" located on each of 12 Building's Section, of which there are six with a 1-Row and 2-Row — one Grievance "Drop Box" per row.

We were obstructed from adequate access to the Grievance Procedure by the Warden's acts and omissions that caused no staff to be employed in that Dept. at all for nearly an entire year; and thus no meaningful occasions to retrieve any material evidence in the prosecution of suits for non-frivolous case presentation to any court.

Presently, I and the Plaintiff are on the Psychiatric Caseload. What that means is we are diagnosed with a serious psychiatric mental disorder or psychosis and are presently prescribed psychotropic medications that are supposed to treat our ailments. Further, we who are here in Restrictive Housing are locked inside of a 12ft x 6ft by 10ft cell (24) hours a day regularly unless staff decide to provide an opportunity to participate in scheduled out-of-cell recreation in the recreational areas outside or on the Section, single-man recreation, one-hour per day — though recreational opportunities are not afforded each day, as they should be according to the Restrictive Housing Plan.

The Correctional Managed Health Care Policy (C.M.H.C.) provides the rules for accessing mental health care. In TDCJ, and, especially on Michael Unit, there is no adequate mental health care because there have not been any mental health care providers assigned to Michael Unit since last year. They all quit, verbalizing their ongoing frustrations with TDCJ's failure to allow access to adequate and meaningful health care, by refusing to ever escort any of us to the providers offices, as required by health care policy and client-provider privacy rights as I understand them and relate to prisoners. I have personally witnessed this person, this Plaintiff suffer mental deterioration, compelled fear, and shut down socially from depression bouts.

## II
## DECLARATIONS

I, Reidie James Jackson, do hereby declare under penalty of perjury that the foregoing is true and correct (28 U.S.C. §1746). November 20, 2023. /s/ Reidie James Jackson

# Texas Department of Criminal Justice

## STEP 1

## OFFENDER
## GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: _____

Date Received: _____

Date Due: _____

Grievance Code: _____

Investigator ID #: _____

Extension Date: _____

Date Retd to Offender: _____

Offender Name: **Daniel D. Dillard**   TDCJ # **01400285**

Unit: **Michael**   Housing Assignment: **12 FC4D**

Unit where incident occurred: **Michael - 12 building - C-Pod 15**

---

You must try to resolve your problem with a staff member **before you** submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? **Lt. Lacey**   When? **11-9-2023**

What was their response? **Use of Unnecessary Force**

What action was taken? **I was tear gassed, attacked, stripped naked, left that way for 3 days**

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

On November 9, 2023, on C-Pod 12 building, I requested on several occasions to speak with a supervisor because I was having a full blown panic attack. I had just found out via the Securus tablet's Law Library app; that the court had made final judgment concerning a TDCJ conditions of confinement case (civil action No. 7:19-cv-00081-M). I had already informed the mailroom that I had NOT received these documents. Almost a month has passed and I still have not received these documents. After being ignored about the deliberate access to courts, I started a fire. In retaliation for that I was placed under an unconstitutional unit level policy tagged "S.O.S," or Security Observation, this policy allowed TDCJ officials and employees to place me naked in a filthy cell covered in feces, urine, other human waste for 4 days. The cell was empty.

---

I-127 Front (Revised 11-2010)   **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**   (OVER)

Appendix F

United States Court of Appeals

Dillard v. Davis
7:19-cv-00081-M

Please Preserve that last 21 days of security video footage
for 12 building especially C-Pod. For evidentiary purpose

Action Requested to resolve your Complaint. Preserve the last 21 days of security video
footage for 12 building.

Offender Signature: Daniel D. Dillard                    Date: November 17, 2023

**Grievance Response:**

**Signature Authority:** _____          **Date:** _____

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response.
State the reason for appeal on the Step 2 Form.

**Returned because:**      *Resubmit this form when the corrections are made.

☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days. *
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments. *
☐ 5. No documented attempt at informal resolution. *
☐ 6. No requested relief is stated. *
☐ 7. Malicious use of vulgar, indecent, or physically threatening language. *
☑ 8. The issue presented is not grievable.
☐ 9. Redundant, Refer to grievance # _____
☐ 10. Illegible/Incomprehensible. *
☐ 11. Inappropriate. *

**UGI Printed Name/Signature:** _Day/Day_

**Application of the screening criteria for this grievance is not expected to adversely
Affect the offender's health.**

**Medical Signature Authority:** _____

I-127 Back (Revised 11-2010)

**OFFICE USE ONLY**
Initial Submission          UGI Initials: _NO_
Grievance #: _2024038064_
Screening Criteria Used: _08_
Date Recd from Offender: _11-22-23_
Date Returned to Offender: _11-22-23_
**2ⁿᵈ Submission**          UGI Initials: _____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____
**3ʳᵈ Submission**          UGI Initials: _____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

Appendix )

EXHIBIT - C

Administrative Grievance # 2024038054

EXHIBIT - D

# Solitary Confinement in Texas: A Crisis with No End

**Written by**
Texas Civil Rights Project and
The University of Texas School of Law Civil Rights Clinic,
with data provided by Texas Justice Initiative and
The UCLA School of Law Behind Bars Data Project



# Acknowledgements

This report was principally authored by Molly Petchenik, staff attorney at Texas Civil Rights Project, and Zoe Dobkin and Julia Draper, students at the University of Texas School of Law. Dustin Rynders and Lia Sifuentes Davis oversaw the project. Michael Everett and the Behind Bars Data Project at the UCLA School of Law contributed to the data-based sections of the report, with data obtained by Texas Civil Rights Project and from the Texas Justice Initiative. Alycia Castillo, Sharon Dolovich, Ashley Dorsaneo, Jenny Hixon, Aaron Littman, Eva Ruth Moravec, Adrianne Nelson, Brittany Robertson, Texas Prisons Community Advocates, and Sebastian Gomez de la Torre also provided valuable feedback and other contributions. Thanks always to the individuals currently and formerly in solitary confinement who shared their stories with us.

# About Texas Civil Rights Project

We are Texas Lawyers for Texas Communities. The Texas Civil Rights Project believes in a Texas where everyone can live with dignity and justice, and without fear. Since its founding in 1990, TCRP has brought thousands of strategic lawsuits and spearheaded countless advocacy campaigns to protect and expand voting rights, challenge injustices in our broken criminal legal system, and advance racial and economic justice for historically marginalized communities on the border and throughout the state. TCRP's Criminal Injustice team partners with impacted communities in an effort to challenge injustices at the front and back ends of the criminal legal system, from overcriminalization to conditions of confinement.



**TEXAS**
CIVIL RIGHTS
**PROJECT**

**LEGAL MAIL – CONFIDENTIAL**

December 12, 2023

Dear Friend,

I am writing to follow up on the conversation you had in March 2023 with myself or a member of my team about your experience in solitary confinement. Based on our conversation, and others like it, Texas Civil Rights Project has written a report on the current state of solitary confinement in TDCJ. As we discussed, we have used the report to ask the United States Department of Justice (DOJ) to open an investigation into TDCJ's use of solitary confinement.

We sent the report to DOJ on December 7 and released it publicly on December 8. A copy of the public report is enclosed with this letter.

We are incredibly grateful for your willingness to share your experience and contribute to this process. We know it is not easy to speak about these issues, but your words have already made an impact on many people who have seen the report.

We included only a few names of individuals in the report, in the interest of safety. However, we shared other names privately with DOJ (only if you told us we could). Even if your name is not in the public report, the information you shared was invaluable.

We do not know how DOJ will respond to our request for an investigation, but whatever happens, we will use this report to continue advocating for change in TDCJ.

Thank you again for sharing with us.

All my best,

Molly Petchenik
Staff Attorney
Texas Civil Rights Project
1405 Montopolis Dr.
Austin, TX 78741

Oficina Legal Del Pueblo Unido
P.O. Box 17757
Austin, TX 78760
512-474-5073 | txcivilrights.org

# Table of Contents

**I. Introduction**                                                                                          **1**

**II. By the Numbers**                                                                                    **2**

**III. Solitary Confinement Is Mental and**                                              **4**
**Emotional Torture**

**IV. Staffing Shortages Force Officers to Cut**                                 **8**
**Corners and Endanger Incarcerated People**

**V. Solitary Confinement Imposes Unique**                                    **11**
**Burdens on Women**

**VI. People Are Placed in Solitary for Arbitrary**                         **12**
**Reasons and Without a Path Out**

**VII. The Grotesque Conditions of Solitary**                                 **14**
**Confinement Cells Violate Human Decency**

**VIII. Texas Deprives People in Solitary**                                      **15**
**Confinement of Their Most Basic Needs**

**IX.  "Super Seg" Takes Solitary Confinement**                         **17**
**to the Extreme**

**X. Conclusion**                                                                                       **18**

# I. Introduction

In January 2023, at least 300 men in Texas prisons began a hunger strike to protest the egregious conditions of solitary confinement across the state.[1] Their protest was for good reason: Texas is a national leader in solitary confinement, also known as restrictive housing. With a solitary confinement population of almost 4,500 as of December 2022,[2] only Florida keeps even half as many people in solitary confinement.[3] Texas is even more of an outlier in long-term restrictive housing. The Texas Department of Criminal Justice ("TDCJ") holds more people in restrictive housing for three years or more than every other state and the federal government combined.[4] At least three quarters of the people in restrictive housing in Texas stay for more than six months.[5] And yet Texas prisons are no safer than any others. This overuse of solitary confinement, especially prolonged isolation, serves no one. Given this state of affairs, **we request that the United States Department of Justice ("DOJ") open an investigation under the Civil Rights of Institutionalized Persons Act into solitary confinement in Texas.**

Solitary confinement is generally recognized to refer to isolation in a cell for at least twenty-two hours per day.[6] In 2017, TDCJ officially ended the practice of solitary confinement as punishment.[7] However, the change was one in name only: thousands remain in the same form of restrictive housing. Indeed, TDCJ released only 76 people from punitive solitary confinement following the policy change.[8] TDCJ maintains administrative segregation as its highest security classification.[9] For our purposes, we consider all forms of isolation in TDCJ, whether administrative segregation, protective custody, security detention, pre-hearing isolation, isolation pending an offender protection investigation, or state jail special management. We refer to all these types of confinement as restrictive housing or solitary confinement.

Texas Civil Rights Project ("TCRP") and its allies have monitored solitary confinement in the state for nearly a decade. In 2015, TCRP and the ACLU released a report documenting the rampant human rights abuses in this system.[10] TCRP released a subsequent report in 2019.[11] That work culminated on October 20, 2021 in a letter to the Department of Justice[12] requesting that they open an investigation under the Civil Rights of Institutionalized Persons Act.

In the nearly two years since TCRP called on DOJ to open an investigation, people have continued to suffer in solitary with no change in sight. This report, compiled in collaboration with the Civil Rights Clinic at the University of Texas Law School (the "UT Clinic"), provides updated information, illustrating that conditions have not improved in Texas prisons. New data summarized by the Behind Bars Data Project at the University of California Los Angeles School of Law, with data provided in part by Texas Justice Initiative, provides a more accurate picture of the magnitude of the crisis. As the series of letters and publications should make clear to any observer, the devastating human and civil rights failures persist, and are unlikely to change absent a strong intervention. It is more apparent than ever that DOJ's intervention is warranted and necessary.

We have chosen to focus on two prisons where the injustices of solitary confinement are particularly egregious—in the size of the solitary population, the extent of understaffing, and anecdotal evidence of conditions there. Those facilities are the H.H. Coffield Unit ("Coffield") and the Mark W. Michael Unit ("Michael"). Not insignificant is the fact that these two prisons are located side by side, a mere four-minute drive apart. Both are located in Tennessee Colony, Texas. We urge DOJ to begin an inquiry at these two facilities.

During the winter and spring of 2023, TCRP and the UT Clinic conducted research and interviews, reviewed data obtained from TDCJ through Public Information Act requests, and visited these two prisons to speak with the people incarcerated there. The following report illustrates that the problems we have repeatedly identified have not resolved—indeed, in some cases, they have continued to grow. Across the system as a whole, and at Coffield and Michael in particular, hundreds upon hundreds of individuals languish in conditions that in any other setting would be considered torture. **TCRP and the UT clinic request that DOJ immediately open an investigation into the practice of solitary confinement at Coffield and Michael prisons.**

**A note on names.** Most of the names in this report have been removed for the safety of the individuals. We have heard numerous, consistent reports of retaliation by staff at all levels against individuals who speak up about the conditions in which they live. The few names we have included are of people who understand the risks and have given consent.



*"You start to think everything is negative. I'm hopeless, I can't talk to family, I'm depressed all the time. You want to hug family when you go through things. I don't feel like getting up."*

**–Daniel Dillard, Michael Prisoner, 4.5 years in solitary, 2023**

# II. By the Numbers

We obtained data from TDCJ documenting the number of people in solitary confinement, broken down by facility, for each month from December 2020 through December 2022. The number of people in solitary confinement in each unit fluctuates over time, but some facilities stand out from the rest in the sheer number of people they hold in isolation.

The Behind Bars Data Project at the UCLA School of Law summarized the data from these facilities and TDCJ as a whole. Their summary data found eleven Texas facilities use restrictive housing at higher rates than the national average for U.S. prisons (6.7 percent in 2019).[13] We identified ten of these facilities as "High Restrictive Housing" ("HRH") facilities and compared them with other maximum-security TDCJ facilities and all other TDCJ facilities combined.[14] This descriptive analysis is limited: it only assesses associations, and does not assess causality.* The summary data does not contain information on whether deaths occurred among individuals in restrictive housing, only on whether deaths occurred within HRH facilities. Additionally, comparative national estimates for U.S. prisons, particularly for suicide and staffing rates, are only currently available up to 2019. Despite these limitations, the relationship among high rates of restrictive housing, high rates of mortality, and low rates of staffing in the TDCJ system is apparent and concerning.



TDCJ Facility Average Population in Restrictive Housing (2020-2022)



TDCJ Facility Demographics (2020-2022)

*The partners involved in this report are currently carrying out a more robust statistical analysis of this data with tests of significance.

The demographics of HRH facilities show that solitary confinement may be applied unequally. HRH facilities, as a group, have greater proportions of non-White incarcerated people aged 35-64 than other maximum-security facilities and all other TDCJ facilities. These facilities also generally have higher mortality rates than other TDCJ facilities. Indeed, HRH facilities, as a group, had greater average crude mortality rates for all combined causes of death than all other maximum-security facilities and all other TDCJ facilities for every year from 2016 to 2022 except for 2020, at the height of the COVID-19 pandemic. This means higher death rates in HRH facilities than others. Although the depth of analysis was limited, our reviews suggest a troubling reality of dangerous and potentially unequal placements in solitary confinement.



> *"I'll go to work, I'll work the fields, anything to make my day go faster. I want to stay busy. If you try to better yourself, it doesn't matter, you're just gonna stay in a box. We grow up in here. I'm not the same 26-year-old man that walked in here."*
>
> –Michael Prisoner, 2023

# III. Solitary Confinement Is Mental and Emotional Torture

It is no secret that solitary confinement wreaks havoc on the mind. The isolation and monotony can cause psychiatric disorders and exacerbate preexisting mental health conditions.[15] The people we spoke with had spent anywhere from several months to decades—in one case, 33 years—in isolation. To make matters worse, there is little to no access to mental healthcare for people in solitary confinement, and the care they do get is unreliable and inadequate. Solitary confinement is psychic torture, and leaves mental scars that last long after release.



*"Being in seg like this is very depressing, and after time goes by you experience hearing things and schizophrenia, start thinking people out to get you."*

**- Coffield Prisoner, 2.5 years in solitary, 2018**

Even if someone does not enter solitary confinement with mental health concerns, the debilitating conditions can cause them to develop serious psychiatric symptoms.[16] For decades, experts have documented these symptoms, including anger, boredom, stress, loss of a sense of reality, suicidal ideation, trouble sleeping, lethargy, impaired concentration, confusion, memory loss, paranoia, panic attacks, hallucination, delirium, and depression.[17] Physiological symptoms are also common, including headaches, heart palpitations, sensitivity to noise, muscle pain, problems with digestion, loss of appetite, and dizziness.[18] These symptoms can set in after only a few days in isolation, and may persist after release. Mental health experts have even identified the effects of solitary confinement as a specific psychiatric syndrome.[19]



*"It's messed up. A lot of us get depression, it's hard to sleep because of all the noise going on and the laws making a lot of noise. I've been in Seg for 5 years, so my eyes are sensitive to the sun. We don't go outside, so my eyes hurt when I see the sun. You can look it up, and see how many people killed themselves being depressed in this unit alone."*

**- Coffield Prisoner, 5 years in solitary, 2020**

One person we spoke with compared the experience to isolation during the COVID-19 pandemic—psychologically devastating to many—but at an exponentially greater magnitude. In light of the research and a newfound understanding of the effects of isolation, it is unsurprising that some people must resort to measures like setting fires in or flooding their cells, self-harm, and even suicide. Others scream, throw feces, or refuse to eat. The specific reasons behind these actions vary, but such behavior may be the only way to get anyone to pay attention to one's needs. Some people cut themselves in an attempt to get off of the unit. Sometimes staff respond so slowly that it is too late. Even when people cannot see or hear the incidents, they see blood running on the floor from cells into the dayroom.



*"You would like to think it doesn't [affect your mental health] but it does. You notice in the free world, [you] don't feel comfortable being around people, [you] can't be inside. [You get] used to talking to people without looking at them and can't hold eye contact. You get frustrated easily back here [and] need patience. You get screwed over a lot on everything, things you're supposed to have by law."*

**- Joshua Sweeting, Coffield Prisoner, 2023**

When people in solitary confinement do receive mental healthcare, it is usually superficial and unreliable. TDCJ policy requires staff to conduct mental health checks for people in solitary confinement at least every week.[20] But these checks amount to little more than a cursory "how are you?" or "are you okay?" without any follow up or care. If someone says no, they are not okay, the medical staff just keep walking. Some people reported staff skipping mental health checks on a regular basis. In addition, at least one person at Coffield reported that other incarcerated people had started conducting mental health checks instead of staff. This troubling delegation of responsibility destroys any semblance of confidentiality.



> *"Evaluation? They periodically come by my cell ask if I'm OK and that's it. If you say you have a problem they tell you that you have to send an I-60."*
>
> **- Coffield Prisoner, 21 years in solitary, 2020**

Even when staff perform mental health checks, they are cursory at best. For more in-depth 60-day checks, staff check off questions pro forma, with no inquiry into a person's actual mental health needs. This lack of services may be unavoidable, as a single mental health provider simply cannot keep up with the volume of checks required. Even spending a minute with each person becomes infeasible when one staff member must check nine wings in a morning, and complete a four-page form for each person. If someone happens to be in the shower during these cursory checks, they get skipped and must wait another two months. Further, in these circumstances, doctor patient confidentiality is nonexistent. In fact, one person we spoke with walks to medical for each of his 60-day checks rather than have his mental health evaluated in the open in front of his peers. He stated that he is the only person who does this—every other person who undergoes a routine mental health check gives up their privacy as a part of the process.

People who need regular psychiatric care outside of mental health checks cannot depend on prison staff to properly provide their medication. One man reported that although he is supposed to receive psychiatric medication twice a day, he had not received his evening medications for several weeks at the time of our visit. When he informed medical staff in the morning, they told him they could not help because "they don't know what the nightshift does." This treatment reflects an inability to care for people in solitary and a cruel indifference as to their wellbeing.

Tragically, people who do not receive mental healthcare sometimes take their own lives as a result of their suffering. This is especially true in solitary confinement, where, on the whole, people are more likely to engage in self-harm or suicide.[21] According to the Prison Policy Initiative, "even though people in solitary confinement comprise only 6%-8% of the total prison population, they account for approximately half of those who die by suicide."[22] In Texas, the number of people who die by suicide in custody has been increasing since 2005.[23]



> *"There are more suicides and attempted suicides in ad seg. I have feelings of hopelessness. We only get to go outside rec about once every 3 months and its so early that we barely get my sun."*
>
> **- Coffield Prisoner, 38 months in solitary, 2017**

The data analysis underscores the personal accounts of psychological torture, culminating all too often in suicide. Both the rates and raw numbers of suicide in TDCJ facilities appear to be at an all-time high.[24] Between 2020 and 2022, there were an average of 52 suicides per year in TDCJ facilities, or **one suicide per week**. This appears to be the greatest number of annual suicides ever recorded in the TDCJ system. Nationally, only one other state prison system appears to have ever reached comenserate numbers of reported annual suicides. In 2006, California recorded 42 suicides in California Department of Corrections and Rehabilitation (CDCR) facilities, prompting a scathing rebuke by the U.S. Supreme Court.[25,26]

The average crude suicide rate in TDCJ from 2020 to 2022 was **86 percent greater** than the the average for U.S. prisons in 2019, the most recent available year of available federal data.[27] It is unknown to what extent suicides in U.S. prisons have changed since 2019 or the effect on suicide rates of the COVID pandemic. This difference may therefore be smaller when looking at more recent data. Still the sheer number of recent suicides in the TDCJ system is concerning.

HRH facilities are a key driver of TDCJ's record number of suicides. There were more suicides in both HRH and non-HRH facilities in 2020 compared to 2019. However, since 2020, annual suicides in non-HRH facilities have declined to a six-year low, while annual suicides in HRH facilities have reached a six-year high. Over the last three years, **54 percent** (or 84 of 156) of the suicides in the TDCJ system have occurred in HRH facilities even though these facilities incarcerated only **30 percent** of the total TDCJ population. These numbers reflect only people who have died from suicide—they do not account for the many attempts or other instances of self-harm.







Everyone we spoke to at Coffield and Michael told us they had seen people pushed to their mental and emotional limits, and had either seen people attempt suicide or contemplated suicide themselves. One man at Michael saw two people hang themselves within hours of each other. Joshua Sweeting told us about a man who was frustrated that the voice recognition required to operate his tablet was not working. When he said he was suicidal, an officer laughed at him. He then cut himself, and it took the officer 30 minutes to respond. Edwin Schneider told us about a 29-year-old who he was close to—the man called him uncle—who hung himself when he had only two years left on his sentence. Mr. Schneider told us, "What really hurts me is all my fellow inmates I've seen lose their minds in here."

Experts agree that solitary confinement is psychologically devastating, and amounts to torture that can lead people to harm themselves or others. Yet, TDCJ uses it as a catch-all solution to security threats, overcrowding, and disciplinary concerns. This practice endangers the people involved and amounts to cruel, unusual, torturous punishment, which drives people to psychotic breaks and even, sometimes, to take their own life. **DOJ should investigate the mental health impacts of solitary confinement at Coffield and Michael.**

# IV. Staffing Shortages Force Officers to Cut Corners and Endanger Incarcerated People

TDCJ has struggled with an extreme staffing shortage for years, leading to deadly consequences for officers and incarcerated people alike.[28] Even the positions that are essential for security are not consistently filled, despite requirements to the contrary. While the vacancy rates are plainly unacceptable, they still may understate the problem. Reporting is not standardized across regions and prisons, and a former TDCJ employee told us that some facilities artificially inflate their staffing numbers. For instance, when employees work overtime for half a shift, facilities may record that position being filled for the entire shift. It is also possible that certain facilities do not include non-critical positions, that are nonetheless important to a prison's operation, when reporting staffing levels and vacancies to TDCJ headquarters.

HRH facilities have even more serious staffing issues than elsewhere in the system. HRH facilities, as a group, had greater average staff vacancy rates and incarcerated-people-to-correctional-officer ("IP-CO") ratios than other maximum-security facilities and all other TDCJ facilities.[29] HRH facilities first surpassed an average IP-CO ratio greater than 9 to 1 in September 2021. This ratio was **34 percent higher** than other maximum-security TDCJ facilities (6.7 to 1) and all other TDCJ facilities (6.8 to 1) during the same period.[30] While national data is not available past 2019, these estimates for HRH facilities are greater than the most recently available average IP-CO ratios for U.S. prisons (5 to 1 for prisons of similar population size and 4 to 1 for maximum-security prisons).[31] Staffing vacancies in U.S. prisons have likely increased nationally since 2019, as in Texas, because of the COVID pandemic.







**TDCJ Facility Average Vacancy Rates (2020-2022)**

32

Holding people in solitary confinement requires more staff than other types of incarceration. This is due in part to the heightened security measures imposed on people in solitary. Incarcerated people depend on staff for things like access to showers and toilet paper—which are readily accessible to people with lower security classifications. At some security levels, two guards must escort a person whenever they leave their cell. This is a question of priorities: prisons allocate staff for five-person teams for cell searches while depriving people of basic necessities like time outdoors when the few available officers are assigned elsewhere.



> **"Ad seg inmates are not taken seriously to be taken to medical due to unit proclaims of short of staff or nobody's available at the time to escort ad seg . . . . [G]uards are assigned to help out to favor general population inmates."**
>
> **- Coffield Prisoner, 2 years 5 months in solitary, 2017**

It is common for one officer to be assigned to three wings—responsible for approximately 180 people alone. Sometimes people go fifteen hours without seeing a single officer. This means it is logistically impossible for people to leave their cells with any reasonable frequency. One person noted that officers "can only do what they can do—we get cut on the short end." Almost every individual we spoke with reported frequently missing recreation and/or shower time due to lack of staff. Staff also used the hunger strike as an excuse to shut down recreation and leave people in their cells. While officers in general population prisons can facilitate recreation or dayroom time for many people at once, security protocols for people in solitary dictate that only two people can be in the dayroom at once, and they must be chained to opposite sides of the room so that they cannot interact. One person told us they are lucky to get out of their cells two days a week.

There are rarely enough staff to allow multiple rounds of people to have recreation on a given shift. As a result, people are left chained in the dayroom or recreation cages for six or seven hours because officers' attention is needed elsewhere. Similarly, people may not get out of their cells to shower for days, or have to choose between showering and the poor excuse for recreation that is available to them. Outdoor recreation is nonexistent at Coffield and other units because there are not enough officers to facilitate it. Multiple people told us that being let out of their cells depends entirely on which officers are working. When certain officers are working, they know they will not be allowed to leave for the entire four-day shift. Short staffing can also mean people do not get to see family when they visit, if staff do not want to escort them.

As a consequence of these staffing shortages, some officers task incarcerated people with jobs that should be performed by staff. Individuals we interviewed have witnessed other incarcerated people doing count and security checks, passing out mail, and, as discussed, performing mental health checks on some units. As one man described, this "lets inmates dictate what others can have." He does not send letters when staff let incarcerated people run mail. He commented that Michael has essentially brought back the outlawed "building tender" system of prisoners running the prison—"it's whatever the inmate decides to give you." Not only does this clearly invade people's privacy, but it also creates potentially dangerous power dynamics between residents of a unit. Several people told us that trusties and

Level 1 prisoners are the only people who do any work, but they still require staff escorts, leading to delays. While TDCJ policy requires staff to do rounds every 30 minutes, it is not unusual to go all day without seeing an officer. Incarcerated people also commonly, crudely joke that staffing shortages are so bad, "if you die in your cell, you probably won't even be found until shift change."

Short staffing can put a strain on relations between incarcerated people and staff. Most people described staff as lazy—one person said "they check in their 'give-a-damn' before they go to work." Others described some as hostile and prone to retaliation. One person told us an officer called him the n-word. Officers are known to retaliate against people who advocate for themselves, including through the hunger strike. Joshua Sweeting had a friend come to visit him at Coffield all the way from Houston. Officers told the friend Mr. Sweeting refused the visit, but no one told Mr. Sweeting he had a visitor, and no one was told to pull him out from segregation, so he missed the visit.

Several people told us about frequent random shakedowns. Recently at Coffield, these shakedowns have been happening around 3 a.m. One person described having his cell tossed every month because he is on the "high profile list." Daniel Dillard described having his cell "destroyed," with his family pictures thrown everywhere, and baby powder sprinkled over his possessions. One person expected to have his cell shaken down the night of our visit.



> *Edwin Schneider has been in solitary continuously for 12 years—and for 8 years before that. He explained to us that in solitary, people only get one of everything—one cup, one bar of soap, and so on. This makes some people obsess over where everything goes, and having everything in its place. In this state of mind, it is especially upsetting when staff come in and toss your cell. Mr. Schneider told us his cell was recently tossed, his legal materials scattered everywhere, and his paperwork and family photos taken, some ending up in the toilet. He told us, "It drives me crazy when they mess things up, scatter everything, step on it." He has filed grievances to no avail.*

Staffing shortages also have negative consequences for employees. Incarcerated individuals have remarked that "they're burning out the staff, and it heightens tensions." For instance, TDCJ regularly requires staff to work mandatory overtime, sometimes in facilities other than the ones they are assigned to, to compensate for understaffing.[33] Notwithstanding these heightened requirements, officers are punished when there are not enough staff to run operations according to policy—a state of affairs entirely out of their control. Disciplining individual employees for systemic failures is unfair and does nothing to remedy the underlying issues affecting people's lives. The bleak work environment also leads to staff suicides. One incarcerated individual we spoke with described how she personally knew two officers who took their own lives.

The staffing shortages in solitary help no one—neither the incarcerated people nor the staff. They only exacerbate existing injustices, leaving everyone worse off. **We request that DOJ look into the effects of understaffing for those in solitary confinement.**

# V. Solitary Confinement Imposes Unique Burdens on Women

The experience of solitary confinement for women in Texas is similar to the experience of men in many respects. Women are put in the same bare-bones cells and subjected to the same mental and physical deprivations. However, women face additional obstacles on top of inhuman conditions of solitary for anyone who experiences it. Four out of five women in Texas state prisons are mothers,[34] and most are the primary caretakers of their children[35] At some security levels in solitary, people are only allowed one visit per month, always non-contact.[36] Women and their families both suffer from this isolation. Women are not allowed to bring menstrual products with them when they are transferred between facilities, meaning in solitary confinement they must rely on overworked, inattentive staff for their most basic needs.

Once a woman is in solitary, it is very difficult to get out. People in solitary confinement for serious disciplinary cases—such as spitting at or attacking an officer—are assessed every six months. On paper, these reviews should offer a path out of solitary, but anecdotally, if a person has any disciplinary cases on their record, the review board will not release them from solitary. As one woman told us, "The problem with this is that when you're in that [solitary] room, in that environment, you already have no voice. Your patience is pushed to the limit. The only way you feel like you can be heard is yelling out the door and yelling profanities, and now you have a disciplinary case that they'll point to when you go to the board [and which will prevent you from being moved to general population]." Women in protective custody, women with mental health conditions, and women who are between placements, can also be housed in solitary indefinitely. **DOJ should investigate the impacts of solitary confinement on women in Texas.**

*Marci Marie Simmons, who was incarcerated from 2011-2021, was placed in solitary confinement for disciplinary reasons multiple times during her incarceration. She shared her experience with us:*



> *"I saw an older lady crying during mail call and hugged her shoulders. Within 20 minutes, I heard keys jingling and saw something like a SWAT team. I knew someone was in trouble. Then they came for me. They saw me give that woman a hug, and since contact is prohibited they put me in solitary. I was in solitary for 34 days—17 days for investigation and another 15 for punishment.*
>
> *When they take you to solitary, they strip you, take your clothes, and give you a gown. No bra or underwear. It's incredibly hot. The cell was about nine by nine feet. Lots of graffiti, some stuff written in blood, prayers. People have been suffering there so that's very apparent on the messaging. You're in that small space, you're getting fed through a tray slot. If you want chow [food], you need to get on your knees at the back of the cell and face the wall. It's so humiliating to have to get on the floor to be able to eat. You will skip meals so you don't have to do that.*
>
> *I had a visit during that time. I had to strip. They gave me a jumpsuit to wear, but the only one available was XXXL. I didn't have a bra on, I didn't have a commissary purchased T-shirt because I didn't have dorm property. I was trying to keep myself from hanging out of that. Then I had to strip again before they took me to a box. My grandmother was on the other side of the glass. My grandmother could see the officers escorting me. It was almost enough to say never mind, because I didn't realize my grandmother would see everything. When they put me in the box, I had to go on my knees and put my hands through a slot for them to uncuff me. When I sat down I picked up the phone and my grandmother said, 'what did you do that they're doing that?' It sounded so crazy to say 'I hugged somebody.'"*

# VI. People Are Placed in Solitary for Arbitrary Reasons and Without a Path Out

Arbitrary rules surrounding solitary confinement allow TDCJ to punish people for normal human reactions to difficult situations. When officers use solitary as punishment in an inconsistent manner, the result is often disproportionately harsh discipline for small infractions. Marci Marie Simmons was first placed in solitary because she comforted a friend in distress with a hug. Daniel Dillard was initially placed in solitary because he refused to take off his shoes during a strip search in an unsanitary shower. He has now been in solitary for four and a half years. Such an extreme punishment for these infractions is unfair, unnecessary, and detrimental to the rehabilitation process.

Once in solitary, it is nearly impossible to get out. According to TDCJ policy, administrative segregation placements must be reviewed by the State Classification Committee ("SCC") after seven days, then 60 days later, and then every 180 days, except that placements based on STG status are reviewed annually.[37] After the first 7-day and 60-day reviews, people in solitary are, by policy, allowed (though not required) to attend review hearings, and to present a statement, written statements from witnesses, and evidence to support their release to general population.[38] In practice, these procedural safeguards are nowhere to be found. During the decade that he has spent in solitary, one person at Michael said that he has never been notified about a review hearing. Several people we spoke with have resigned themselves to never getting back to general population. With parole dates approaching, they will be released directly into the community after spending years in solitary.



> *"I have had to watch fellow inmates try to kill themselves, watched many lose their wives, kids, and family support because we are denied parole–year after year for the same reason. STG[.] We have no access to media coverage other than radio bought off commissary, no TV, no contact visits, no school, church, no physical contact for years or forever. [N]o sunlight meaningful reviews . . . . We eat cold food alone. We have no hope for a better tomorrow."*

**Coffield Prisoner, 9 years 6 months in solitary, 2021**

Daniel Dillard has filed numerous grievances about his solitary placement. His Unit Classification Committee ("UCC") and SCC paperwork have a blank line where there should be a reason for the administrative segregation placement. His grievances are never answered; instead, he has received a series of manufactured excuses, including that his case has already been reviewed by the UCC or that he was unable to sign a form. He has provided five program certificates to support his release, but the UCC will not look at them. All of the responses are pro forma—the paperwork looks the same no matter what he says. Moreover, no one has told him what he needs to do to get out of solitary or how long he will be there. Regardless, he does not have access to educational or group programming that could help his case. He worries that any mental health programs would force him to go on medication that would make it more difficult to get parole. Without access to education and other programs, Mr. Dillard and others cannot meet the requirements of the parole board.

One common reason people are placed in solitary is being identified as a member of a Security Threat Group (STG). TDCJ defines an STG as "any group of inmates TDCJ reasonably believes poses a threat to the physical safety of other inmates and staff due to the very nature of said Security Threat Group."[39] However, the STG designation is based on a vague and unnecessary policy that sweeps in countless individuals for no demonstrated reason. Even giving a tattoo or displaying a gang sign is enough for TDCJ to brand someone as part of an STG and imprison them in solitary for decades.[40] Sometimes incarcerated individuals are never told why they are labeled STG members. On the other hand, there are many people affiliated with gangs who remain in general population. Staff reportedly prefer to work on the STG wings, where things run more smoothly, drawing into question the justification for indefinite security precautions.

The STG designation is applied based solely on the discretion of prison officials, and is a tool they can use with no oversight to control individuals they wish to punish for any reason. One incarcerated individual we spoke with was branded an STG member and placed in solitary merely for sending and receiving mail from a confirmed member of an STG. Despite the fact that nothing he did threatened the safety or security of TDCJ units, staff, incarcerated people,

or the public, this person's parole was denied for years because of his arbitrary STG classification. Another incarcerated individual was deemed a security threat and given STG status just because of his purportedly gang-related tattoo. Mailing letters and having tattoos are not conduct that cause physical harm or threaten the any person's wellbeing. Yet people are routinely sent to solitary for these innocuous behaviors.

For people in solitary based on STG status, the only way out is through the Gang Renouncement and Disassociation Process ("GRAD"), a time-intensive program that includes requirements of a clean disciplinary record, official gang renunciation, and providing information on the gang and its members to prison authorities. Many people decline to participate in GRAD, even if they have been wrongly labeled STG members. People understand that participating in the program signifies to others that a person has informed on a gang, a dangerous position to be in whether or not it is true. Others do not want to admit to something they are not a part of. Some STG members consider the group their family and do not wish to publicly renounce it. These decisions have no bearing on whether someone is a danger to others, and should not be reason to keep them in solitary confinement. One person tried to file a grievance to challenge his STG status and was told he would have to go to the SCC to challenge it; the SCC told him he would have to file a grievance. He has been in segregation ever since.

Joshua Sweeting, who is in solitary for his STG affiliation (based on his tattoos), has had no gang-related disciplinary history in 22 years in prison. Despite this record, he has no way out of solitary. As he explained, "They give you this label and you get stuck back here. They force you to snitch to go to [general] population. You have to lay your affiliation down [and] slide back from what you are. This is my family." **We request that DOJ investigate procedures for placement in and release from solitary in Texas.**

# VIII. Texas Deprives People in Solitary Confinement of Their Most Basic Needs

People in solitary confinement in Texas face an uphill battle getting even their most basic hygienic and nutritional needs met. We heard consistently that people were rarely allowed to leave their cells. Many regularly went more than a week at a time without the opportunity to shower, or were forced to choose between exercising and showering on the rare occasions that they were permitted out of their cells.

Multiple people at Michael and Coffield reported going for long periods of time without being able to shower. Because of staffing shortages, there are rarely enough officers to escort everyone in solitary confinement to the showers on a regular basis. One person told us the longest he has gone without showering was ten days, because prison staff were not facilitating showers for the people on his block.

Even when there are enough staff, some people avoid showering because it can be an uncomfortable, unpredictable, and even traumatic experience. The showers are metal boxes about 3 feet wide and 6 feet tall, no larger than a porta-potty. One person we spoke to likened showering to being locked in a coffin. Officers can come at the crack of dawn (as early as 4:00 a.m.) to get people to shower. If someone is asleep, they may not get another chance to shower for several days. Early in the morning, the water can be very cold. In the middle of the day, especially during the summer, it can be suffocatingly hot. People are escorted to the showers in restraints and locked in until a staff member lets them out. This could be minutes or hours later, especially when prisons are understaffed. In the showers, they are left in the hot, poorly ventilated boxes to bake. At Coffield, the showers are filthy because there are no cleaning crews assigned to them. Instead of braving the showers, some people resort to "bird bathing," or washing themselves in the small sinks in their cells.

Understaffing alone cannot explain, nor excuse, all of the deprivations. People in solitary may go years without seeing the sun. One person we spoke with at Coffield in March said he was outside most recently last Cinco de Mayo; another said he had been outside five to six times total since 2019; a third said it had had not been outside in nearly three years. Without outdoor space, exercise is limited to the two small and unsanitary recreation cages, outfitted only with a pullup bar, or pacing around one's cell. People can access outdoor recreation at Michael, but even there, they get outside only about once a month and only if people make a fuss about it. If they do go outside, they are greeted with an unsanitary environment: the outdoor urinal is infested with insects, rats, and mold, and floods when it rains. Some people forego outside recreation entirely to avoid this situation. Staff at times put people outside with other prisoners who are known to be difficult to discourage them from leaving their cells.

As Joshua Sweeting pointed out, TDCJ has an easy fix available—simply give people in solitary group recreation. Instead, people in solitary confinement are needlessly subjected to these conditions for years at a time, at the expense of their health, sanity, and humanity.

On top of the lack of hygiene and exercise, several of the people we spoke to in solitary confinement said they never get enough food during meals, and the food they do get is cold, unappetizing, and lacks nutritional value. Many people rely on commissary for food because the meals they are served in solitary confinement are so unsavory. But not everyone can afford commissary, and others have their commissary access restricted based on their security level. One person told us he is only allowed to purchase hygiene products through commissary because of his security level. Another person who has been in solitary confinement since 2013 told us, "If you don't have commissary, you're going to starve."

In addition, people who are prescribed specific diets for medical reasons have trouble getting food that meets their nutritional requirements. According to TDCJ policy, "therapeutic diets are provided at all facilities for patients who dietary management as ordered by a qualified health care provider."[43] Yet one person told us that if you don't speak up to get the food you need, you don't get it. He is on a special high Vitamin D diet, but his meals rarely come with the dairy products he is supposed to receive. He told us that people only get their full meals at the proper times when outsiders com into the prison, because prison staff are on their best behavior. Indeed, while we were speaking with Joshua Sweeting, an officer came up and assured him he would get the lunch he missed during the interview. Mr. Sweeting told us that would never have happened if visitors were not present—he would simply have missed a meal. In addition, people are unable to get the religious meal accommodations they need. A Muslim man who was observing Ramadan told us the prison would not accommodate the meal schedule required for his religious fasts.

# VII. The Grotesque Conditions of Solitary Confinement Cells Violate Human Decency

Solitary confinement cells are designed to be harsh and unforgiving, and many are in a state of total disrepair. Several people we spoke to said their cells are "even worse than the pictures you see in the media." Cells are about 6 by 10 feet—as one person described, 7 steps down, 8 back; 3 steps across, 4 back. Some have no windows, and people go years without seeing sunlight. In many cells, the paint is chipped and the bunks are rusted. There are no pillows on the beds, and the mattresses are lumpy and uncomfortable. One person said he has to stack books on one side of his bed just to keep it from leaning over.

Perhaps the worst parts are the marks left by prior residents. Entire walls are caked with human excrement, and the cells often reek of urine and feces. Many cells are stained with blood. It is apparent from the messages on the walls, some of them written in blood, that people have suffered there. The first thing people in solitary do—"if they haven't lost their minds yet"—is try to get cleaning supplies to scrub their cells.

In solitary, there is little temperature difference between the inside and the outside. Individuals in solitary "cook in the summer and freeze in the winter." Air conditioning in Texas prisons has been the subject of protracted litigation, but as of August 2022, more than two-thirds of prisons in Texas, including Coffield and Michael, do not have air conditioning in most living areas.[41] Summer temperatures regularly break 100 degrees in Texas, which can translate to over 110 degrees in poorly-ventilated prisons.[42] In solitary, people are trapped in their cells without even the ability to shower for some relief from the heat.

All types of wildlife find their way into solitary cells. Many cells are crawling with insects, cockroaches, mosquitos, and rats. It is not uncommon for people to find cockroaches in their food, as well. While some of the people in solitary confinement welcome visits from cats and raccoons (one person we talked to said that these animals were "therapeutic" for people denied human contact), other animals are not so welcome. One solitary guard reportedly picked up a snake from the ground only to discover he was holding a copperhead in his hands. Incarcerated individuals have experienced ant and black widow infestations. Even when pesticide crews come into the cells, infestations quickly return because the cells are insufficiently insulated to keep the bugs out.

Daniel Dillard told us that the physical conditions at Michael are the worst he has ever seen. His cell is next to the dayroom toilet, which constantly smells and attracts rats and cockroaches. The toilet has not worked the entire time he has been there. Cockroaches also crawl out from behind the toilet in his cell. In his cell and many others, the vents are broken, making it difficult to breathe. To get any ventilation on hot days, they have to pop open their tray slots open because there is plastic covering the windows in the cell doors. But popping their tray slots is against policy and could lead to disciplinary action. Ventilation is especially important when people set fires on the unit, a common occurrence. Another person agreed, adding that the cells and walls flood when it rains, the mattresses have ants in them in the summer, it "stinks like nothing but rats," and is generally "unlivable."

The cells in most solitary units do not have showers, and the in-cell sinks and toilets are rife with plumbing issues. In some cells, the occupant must flush the toilet ten or more times before it starts working, and some people have no control over the water temperature in the sinks. Maintenance virtually never comes. We heard from some people that the hot water is always broken, and when it does work it is impossible to turn off—a particularly dangerous issue for people without air conditioning who rely on water to keep cool in the summer. These inhumane conditions do not help people become healthy, productive members of society. Instead, people in solitary are treated worse than animals; the unlivable conditions destroy the human body, mind, and spirit. **TCRP and the UT Clinic request DOJ look into the inhumane conditions of solitary at Coffield and Michael.**



> **"I once found a roach in my food. I filed a grievance form and attached the roach. When the grievance was returned, they said [they couldn't process it because it] had an 'inappropriate attachment.' So I tried to submit it again without the roach, but this time they said there wasn't enough evidence to substantiate the claim. They didn't do anything about it."**
>
> **—Michael Prisoner, 2023**

People are also denied food by officers as a means of punishment. TDCJ actually endorses deprivation of food in response to certain forms of misconduct, such as attempting to save food from a meal to eat later.[44] Since dinner is usually served around 4:00 p.m., many people try to save bread or other food items to eat in the twelve hours until breakfast. But in doing so, they risk losing future meals altogether. One person told us staff will mark down that people "verbally refuse" a meal even when they are never offered food. The same happens for showers and recreation.



> **"Unit proclaimed water isn't drinkable and water has to be boiled: How can inmates boil water if the prisoner not only don't have a pot but TDCJ hot pots don't boil and bleach water can't be boiled drinkable, indigent prisoners don't have hotpots nor furnished with hot pots."**
>
> **- Coffield Prisoner, 2 years 5 months in solitary, 2020**

Finally, medical care in general is inaccessible. People are often left in their cells, unable to get the care they need. People flood their cells or set fires to get a response from staff, and still are not always successful. We heard multiple times that people have to be on the floor passed out to get medical care, and even then, others have to bang on their doors for a "man down" to get officers' attention.

The week we visited Michael, a man "fell out" and started making noise in his cell. Officers did not call the Incident Command System ("ICS"), the proper emergency response, even when alerted that he was on the floor. It took a sergeant 20 minutes to come see him, and then took ICS another 45 minutes to arrive. The month before, another person went "man down." After people banged on their doors, it took staff two or three hours to arrive—by then, he was dead. The next day, the wing got recreation, showers, and a hot meal, in an attempt by Michael to stave off complaints.

We also learned of multiple people who have trouble accessing the insulin they require multiple times a day to live. Daniel Dillard has developed a fist-sized hernia in solitary. He refused medical one time because a he had a legal deadline pending and was afraid he would not get back to his cell in time based on the usual delays. He put in I-60s again to request treatment, but staff told him that officers could take him because of understaffing. He, like others, told us you have to pretend to be unresponsive to get medical care. One person at Michael told us he has been waiting for months or years to receive responses to several different medical requests, including lab results for a lump on his neck. While we were speaking with him, he asked a nurse about the status of his requests. The nurse did not know the status of the requests, who he should contact, or how he could get answers.

Basic necessities like food, hygiene, exercise, and medical care should not be considered luxuries. But for people in solitary confinement in Texas, it is not unusual to go days or weeks without a good meal, shower, exercise, or necessary medical care. This constant deprivation is cruel, inhumane, and serves no legitimate penological function—but it is the norm for people locked up in solitary confinement. **We request DOJ investigate the basic deprivations people are forced to endure in solitary at Coffield and Michael.**

# IX. "Super Seg" Takes Solitary Confinement to the Extreme

In addition to traditional administrative segregation, Coffield is also home to the Administrative Lock-Up ("ALU"), known to people there as "super seg" or "separate seg." The ALU is an unofficial, extreme form of solitary confinement, where isolation is maximized, and people have no contact with those in other solitary units. Its twelve cells are filled with people deemed particular threats to security, often associated with escape attempts—even if those occurred decades ago. There are no programs other than a very limited selection of (mostly Christian) applications on electronic tablets. The whole of ALU is forced to change cells every week, and have their property searched when they do.

The ALU has even fewer procedural protections than traditional administrative segregation. There is no review process, and no formal way out. People spend decades there, trying to get back even to administrative segregation. Grievances go nowhere. Russell Kerr spent 23 years in the ALU, and was released to administrative segregation earlier this year. When one person gets out, another arrives to replace them—the cells are always full.

Many people in the ALU have high mental health needs and "it's tense, one thing could set everything off." People put feces on their walls and flood their toilets, and no one cleans the cells between occupants. Like traditional segregation, it is difficult to get medical or mental health care. The prison must shut down all of medical for one person in the ALU to come in and receive care while confined to a cage. Because of this hassle, sometimes staff will not pull people out for medical care even when they have chest pains and dizziness. When people put in sick call requests, staff do not always process them. Like elsewhere in solitary, people have to go "man down" to be seen by medical. When we visited, eight people in the ALU were on medications, but medical had not been back to the ALU in three weeks. According to one person, the best nurse had recently quit because "they told her she was caring too much about inmates."

Willie Sauls, who has been in the ALU for about a decade, describes it as "like being in a dead time, a ghost time." Before he was placed there, he had never heard of the ALU, as is the case with many people in solitary. Mr. Sauls is not allowed to leave his cell unless he is placed in handcuffs with a "black box" around them. He considers himself lucky, as some people are put in leg irons as well. He usually gets to shower twice a week, although he has gone weeks without being allowed to shower. ALU prisoners usually get recreation twice a week, but he had not been outside in two years when we spoke. One person had just gotten a mattress after living two months without one. Mr. Sauls told us it is "hard to explain, the mental anguish you go through. People try[] to do harm to themselves and others, trying to get shipped away from here." For a period of time the ALU seemed to be getting better, with fewer people and fewer restrictions, but in the six or seven months before our visit, it had gotten much worse and was again full. Mr. Sauls described, "the energy, how isolated it is, the mental pressure that individuals go through, it's like we're hidden away back there." **We request that DOJ look into the specific conditions of the ALU at Coffield.**

# X. Conclusion

Solitary confinement in Texas is a humanitarian crisis that cannot be allowed to continue. TDCJ has failed to protect those in its care, and state legislators have neglected their duty to step in. In the last legislative session, which concluded in May 2023, four bills were introduced addressing solitary confinement. House Bill ("HB") 480 and HB 812 would have limited placements in administrative segregation based on STG affiliation. HB 813 and Senate Bill ("SB") 1312 called for studies on the impact of administrative segregation on people confined there by TDCJ. None of these bills advanced beyond a committee hearing. A bill similar to HB 812 also failed to advance in the previous legislative session. The appears to be little hope of a legislative remedy to this humanitarian crisis.

TDCJ officials have the power to change policies to ensure the individuals in their care are treated with basic human dignity, yet they have refused to act. TDCJ could take on the mantle of failed legislation (HB 813 and SB 1312) and launch its own study commission to identify areas of highest need where it can improve its own practices absent legislative or judicial involvement. It could also make more fundamental changes to its approach to solitary confinement, as have prisons in several other states. For example, researchers at the University of California San Francisco School of Medicine have developed programs in North Dakota,[45] Oregon,[46] and other states to phase out solitary confinement with no increase in violence or security concerns.[47] Such a program in Texas could improve the lives of incarcerated people and staff alike.

**We urge TDCJ to 1) conduct and make public its own study of the problems, effects, and potential areas for change related to solitary confinement, and 2) implement a pilot program under the UCSF Prison Culture Change Initiative to phase out solitary at Coffield and/or Michael.**

Two years ago, we requested that DOJ launch an investigation, a request that has only become more urgent. Now more than ever, it is imperative that DOJ step in. The Department of Justice is uniquely placed to stand up to these abuses and ensure that Texas does not continue to act with impunity. DOJ involvement will make clear that the current abuses can no longer continue, and highlight to TDCJ the need to take action itself. Coffield, Michael, and the system as a whole are ripe for federal investigation, and **we request that DOJ use its authority to investigate the use of solitary confinement in these prisons immediately.**

1 Jolie McCullough, "We are humans back here": As Texas hunger strike wanes, prisoners speak out against solitary confinement, TEXAS TRIBUNE (Jan. 30, 2023), https://www.texastribune.org/2023/01/30/texas-prisons-hunger-strike-letters/; Jolie McCullough, Texas prisoners launching hunger strike to protest state's harsh solitary confinement practices, TEXAS TRIBUNE (Jan. 9, 2023), https://www.texastribune.org/2023/01/09/texas-prisons-hunger-strike-solitary/; Paul Flahive, A month after a hunger strike, some Texas prisoners say they will do it again TEXAS PUBLIC RADIO (Apr. 4, 2023), https://www.tpr.org/news/2023-04-04/a-month-after-a-hunger-strike-some-texas-prisoners-say-they-will-do-it-again.

2 According to data obtained by TCRP from TDCJ under the Public Information Act.

3 Correctional Leaders Association & Arthur Liman Center for Public Interest Law at Yale Law School, *TIME-IN-CELL: A 2021 SNAPSHOT OF RESTRICTIVE HOUSING 11* (Aug. 2022) (hereinafter "Time-in-Cell 2021"). https://law.yale.edu/sites/default/files/area/center/liman/document/time_in_cell_2021.pdf ; Southern Poverty Law Center, *SOLITARY CONFINEMENT: INHUMANE, INEFFECTIVE, AND WASTEFUL* (2019), https://www.splcenter.org/sites/default/files/com_solitary_confinement_0.pdf

4 *Id.* at 11. Data was unavailable for Florida.

5 *Id.*

6 *See* Time-in-Cell 2021, at vii.

7 Trey Shaar, *Texas Ends Solitary Confinement As Punishment, But Still Keeps Thousands Alone In Cells*, KUT 90.5 (Sept. 22, 2017), https://www.kut.org/texas/2017-09-22/texas-ends-solitary-confinement-as-punishment-but-still-keeps-thousands-alone-in-cells.

8 Matt Clarke, *Texas Prisons Stop Using Solitary Confinement as Punishment, but Thousands Kept in Administrative Segregation*, PRISON LEGAL NEWS (July 6, 2018), https://www.prisonlegalnews.org/news/2018/jul/6/texas-prisons-stop-using-solitary-confinement-punishment-thousands-kept-administrative-segregation/

9 Texas Department of Criminal Justice, Offender Orientation Handbook 6 (Feb. 2017), https://www.tdcj.texas.gov/documents/Offender_Orientation_Handbook_English.pdf

10 ACLU & TCRP, A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement in Texas (2015), https://www.aclutx.org/sites/default/files/field_documents/SolitaryReport_2015.pdf

11 Meagan Harding & Peter Steffensen, Torture By Another Name: Solitary Confinement in Texas, Texas Civil Rights Project (2019), https://www.txcivilrights.org/_files/ugd/aab911_99107cf94dac404c9b076e72ec5f92c8.pdf

12 Texas Civil Rights Project, Letter to Steven Rosenbaum, United States Department of Justice (Oct. 20, 2021), https://www.txcivilrights.org/_files/ugd/aab911_35f2829d0cd14cfb8d8dfc76a06f294b.pdf

13 Census of State and Federal Adult Correctional Facilities in 2019, Bureau of Justice Statistics, (2021), https://bjs.ojp.gov/content/pub/pdf/csfacf19st.pdf

14 These facilities were: Ferguson Unit (20.5 percent), Eastham / Wainwright Unit (16.4 percent), Coffield Unit (15.1 percent), Telford Unit (12.5 percent), Allred Unit (12.2 percent), McConnell Unit (11.2 percent), Darrington / Memorial Unit (10.3 percent), Clements Unit (9.8 percent), Robertson Unit (9.3 percent), Michael Unit (8.9 percent), and Polunsky Unit (8.3 percent). Polunsky Unit was excluded from this group, despite having an average RH rate greater than 8 percent, because it holds TDCJ's death row. Death row prisoners are held in solitary confinement, but the issues they face introduce complexities beyond the scope of this report. Litigation is currently underway challenging the automatic solitary confinement of people on death row. *See Robertson v. Collier*, 4:23-cv-00283 (S.D. Tex., 2023). 'All other TDCJ facilities' contains other maximum-security facilities. Facility information for deaths in custody was obtained via address information in Texas Office of the Attorney General custodial death reports. Since not all addresses corresponded or could be identified with a facility, some deaths were not included in these facility-level and aggregate summaries. There therefore may be slight differences in total numbers of deaths when compared to other Texas Justice Initiative or Behind Bars Data Project data.

15 National Commission on Correctional Health Care, Position Statement: Solitary Confinement (Isolation) (2016), https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf

16 *Id.*

17 Peter Scharff Smith, *The effects of solitary confinement on prison inmates: A brief history and review of the literature*, 34 CRIME & JUST. 441, 488 (2006) (hereinafter "*The effects of solitary*"); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124 (2003); Tiana Herring, *The research is clear: Solitary confinement causes long-lasting harm*, PRISON POLICY INITIATIVE (Dec. 8, 2020), https://www.prisonpolicy.org/blog/2020/12/08/solitary_symposium/ (hereinafter "*The research is clear*").

18 Smith, *The effects of solitary*, at 488.

19 Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325, 333 (2006), https://journals.library.wustl.edu/lawpolicy/article/id/843/

20 Correctional Managed Health Care Policy Manual, Health Evaluation and Documentation Inmates in Segregation/Restrictive Housing, TDCJ (Sept. 8, 2022), https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/E-39.01.pdf

21 Homer Venters et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442 (Mar. 2014), https://ncic.gov/solitary-confinement-and-risk-self-harm-among-jail-inmates

22 Herring, *The research is clear*, at 17.

23 Texas Justice Initiative, DEATHS IN CUSTODY (Apr. 2023) https://texasjusticeinitiative.org/datasets/custodial-deaths
Although suicides have declined year-over-year in several individual years, overall, the number has trended up in this time period.

24 According to data obtained and provided by Texas Justice Initiative. Texas Justice Initiative, DEATHS IN CUSTODY (Apr. 2023) https://texasjusticeinitiative.org/datasets/custodial-deaths

25 CDCR incarcerated a prison population of approximately 30,000 fewer incarcered individuals at that time compared to TDCJ from 2020-2022.

26 Justice Anthony Kennedy expressed concern at CDCR's 2006 suicide rate in a 2011 decision: "Because of a shortage of treatment beds, suicidal inmates may be held for prolonged periods in telephone-booth sized cages without toilets. . . . Other inmates awaiting care may be held for months in administrative segregation, where they endure harsh and isolated conditions and receive only limited mental health services. . . . In 2006, the suicide rate in California's prisons was nearly 80% higher than the national average for prison populations; and a court-appointed Special Master found that 72.1% of suicides involved 'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable.'" *Brown v. Plata*, 563 U.S. 493, 504 (2011).

27 We used national data from 2019, the last year the U.S. Department of Justice released standardized information, including information on suicide in U.S. prisons. Suicide in Local Jails and State and Federal Prisons, 2000-2019, Bureau of Justice Statistics, (2021), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf ; Census of State and Federal Adult Correctional Facilities in 2019, Bureau of Justice Statistics, (2021), https://bjs.ojp.gov/content/pub/pdf/csfacf19st.pdf .

28 Jolie McCullough, *"You're not as safe as you should be." How understaffing is affecting one Texas prison*, TEXAS TRIBUNE (May 9, 2018), https://www.texastribune.org/2018/05/09/understaffing-texas-prisons-telford-maximum-security-prison-timothy-da/

29 TDCJ did not provide staffing data for around 22 facilities which were not included in these section of analysis.

30 Full staffing for prison facilities occurs at different IP-CO ratios due to the different security levels and needs of facilities.

31 Census of State and Federal Adult Correctional Facilities in 2019, Bureau of Justice Statistics, (2021), https://bjs.ojp.gov/content/pub/pdf/csfacf19st.pdf

32 N.B. The above metrics are calculated by averaging each TDCJ facility's average IP-CO ratio and vacancy rate from 2020 to 2022 and then plotting these rates by each marker.

33 Matthew Clarke, *Guards Fleeing Texas Prisons*, PRISON LEGAL NEWS (Jan. 1, 2023), https://www.prisonlegalnews.org/news/2023/jan/1/guards-fleeing-texas-prisons/

34 Lindsey Linder, *A Growing Population: The Surge of Women into Texas' Criminal Justice System* , TEXAS CRIMINAL JUSTICE COALITION (March 2018), https://s3.documentcloud.org/documents/4446721/TCJC-Womens-Report-Part-I.pdf

35 Aleks Kajstura and Wendy Sawyer, *Women's Mass Incarceration: The Whole Pie 2023*, PRISON POLICY INITIATIVE (March 1, 2023), https://www.prisonpolicy.org/reports/pie2023women.html

36 Offender Rules and Regulations for Visitation, TDCJ 19 (Nov. 2015), https://www.tdcj.texas.gov/documents/cid/Offender_Rules_and_Regulations_for_Visitation_English.pdf

37 TDCJ Administrative Segregation Plan 16 (2012), https://tifa.org/wp-content/uploads/2014/02/Administrative-Segregation-Death-Row-Plan-1.pdf

38 *Id.* at 17.

39 TDCJ, Security Threat Groups: On the Inside 2 (Dec. 2022), https://www.tdcj.texas.gov/documents/cid/STGMO_FAQ_Pamphlet_English.pdf

40 *Id.*

41 *See Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017); Jolie McCullough, *"It's a living hell": Scorching heat in Texas prisons revives air-conditioning debate*, TEXAS TRIBUNE (Aug. 24, 2022), https://www.texastribune.org/2022/08/24/texas-prisons-air-conditioning/ ; Julianne Skarha et al, *Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons*, 5 JAMA NETW. OPEN 11 (Nov. 2022) https://pubmed.ncbi.nlm.nih.gov/36322085/ ; Julianne Skarha et al., *Heat-related mortality in U.S. state and private prisons: A case-crossover analysis*, 18 PLOS ONE 3 (2023) https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0281389

**Solitary Confinement in Texas: A Crisis with No End**                    **20**

42  See J. David Goodman, *'Man Down!': Surviving the Texas Heat in Prisons Without Air-Conditioning*, NEW YORK TIMES (Jun. 29, 2023),
https://www.nytimes.com/2023/06/29/us/texas-prisons-heat.html

43  Correctional Managed Health Care Policy Manual, Therapeutic Diets and Food Allergies, TDCJ 1 (Sept. 8, 2022),
https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/F-47.01.pdf

44  Correctional Managed Health Care Policy Manual, Alternative Meal Service, TDCJ (Nov. 19, 2018)
https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/E-39.02.pdf

45  David H. Cloud, Dallas Augustine, Cyrus Ahalt, Craig Haney, Lisa Peterson, Colby Braun, Brie Williams, *"We just needed to open the door": a case study of the quest to end solitary confinement in North Dakota*, 9 HEALTH & JUST. 28 (Oct. 2021).

46  Cyrus Ahalt, Colette S. Peters, Heidi Steward, and Brie A. Williams, *Transforming Prison Culture to Improve Correctional Staff Wellness and Outcomes for Adults in Custody "The Oregon Way": A Partnership between the Oregon Department of Corrections and the University of California's Correctional Culture Change Program*, 8 ADVANCING CORRECTIONS J. 10 (2019).

47  University of California San Francisco, *Amend: Changing Correctional Culture* (2023), https://amend.us/



txcivilrights.org

**published December, 2023**

LEGAL MAIL



EXHIBIT - E

# Prison Legal News

## PUBLISHED BY THE HUMAN RIGHTS DEFENSE CENTER

VOL. 33  No. 10
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

**October 2022**

# Looking Deep Inside America's Legalized Torture Chambers

### *by Mark Wilson*

*There are many ways to destroy a person, but one of the simplest and most devastating is through prolonged solitary confinement. Deprived of meaningful human interaction, otherwise healthy prisoners become unhinged. … Not only psychological or social identity but the most basic sense of identity is threatened by prolonged solitary confinement.*

— Lisa Guenther, *Solitary Confinement, Social Death and Its Afterlives* (University of Minnesota Press 2013)

**S**OLITARY CONFINEMENT IS AS OLD AS prisons themselves, from the Mamertine Prison's cages that confined prisoners beneath the sewer system in ancient Rome in 64 B.C. to America's first formal prison — Eastern State Penitentiary, commonly known as Cherry Hill — where the political descendants of Pennsylvania's Quaker founders embraced this barbaric practice of "burying prisoners alive" when they designed it in 1829.

Harry Hawser, a poet imprisoned there in 1840, referred to his eight-by-twelve-foot solitary confinement cell as "a living tomb." Current Supreme Court Justice Sonia Sotomayor recently agreed, noting that solitary confinement "comes perilously close to a penal tomb."

The difference, those early-19th century Pennsylvanians incorrectly believed, was a matter of intent. Convinced that being locked alone in a small cage with no meaningful human contact 24 hours a day for months or years on end would reform criminals, they made solitary confinement a foundational element of Cherry Hill's design and philosophy.

French historian Alexis de Tocqueville and British author Charles Dickens were horrified when they toured Cherry Hill in 1831 and 1842, respectively. Dickens described solitary confinement as "worse than any torment of the body," as the prisoner "is a man, buried alive; to be dug out in the slow round of years." Similarly, de Tocqueville noted that solitary "devours the victim incessantly and unmercifully; it does not reform, it kills."

Nevertheless, Cherry Hill was celebrated wide and far for its "enlightened" approach to punishment. At least 300 prisons throughout America, Europe, and South America quickly replicated its philosophy and design.

But Pennsylvania discovered almost immediately what was obvious to de Tocqueville: Solitary confinement did not reform men, it drove them mad. The Supreme Court first recognized this undeniable truth as early as 1890.

"A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane," the Court acknowledged. "Others, still, committed suicide, while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." See: *In re Medley*, 134 U.S. 160 (1890).

In the 132 years since acknowledging the devastating psychological impact of solitary confinement, members of the Court have repeatedly returned to it. "Years on end of near total isolation exact a terrible price," wrote Justice Anthony M. Kennedy in a 2015 concurring opinion. "Common side effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behavior." See: *Davis v. Ayala*, 576 U.S. 257 (2015).

Other justices have made similar observations. "We … know that solitary confinement imprints on those that it clutches a wide range of psychological scars," Justice Sotomayor noted in 2018, adding with a nod back to *Medley*: "As far back as 1890, this Court expressed concern

## INSIDE

| | |
|---|---|
| From the Editor | 18 |
| SCOTUS Greenlights GA Execution by Firing Squad | 20 |
| AL Prisons Averaging 1 Death Every 6 Days | 22 |
| Deadly Conditions Persist in Nation's Worst Jail | 24 |
| SCOTUS Kills Condemned OH Prisoner's Medical Transport | 30 |
| $3.75m for WA Prisoner Killed by Untreated Breast Cancer | 34 |
| Dark, Smoky Cells | 40 |
| SCOTUS Kneecaps Condemned Prisoners Claiming Ineff. Counsel | 44 |
| 3rd IL Guard Guilty in Prisoner's Fatal Beating | 48 |
| Attorneys, Staff Convicted in MTC TX Prisons Bribery Scandal | 48 |
| WI Guts Protections for Returning Prisoners | 50 |
| $7m to CA Detainee Left Quadriplegic by Guards | 60 |
| News in Brief | 64 |

EXHIBIT-F

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
**State Classification Committee (SCC)**
*Security Detention Review Hearing Record*          F- 40

### I. OFFENDER INFORMATION

*Instructions: Correctional staff shall notify the offender at least 24 hours, and no more than two weeks, prior to the restrictive housing committee (RHC) hearing. Correctional staff shall read the 'notification' to the offender and have the offender sign in. (If the offender refuses, document the refusal. On the hearing date, unit correctional staff shall ensure this form (I-189) and the following documents are available to the SCC: the offender's travel card or a profile, the offender's unit file, necessary computer screens, and appropriate forms (I-169, I-169A and I-201).*

Offender Name  DILLARD,DANIEL                  TDCJ # 1400285          Unit MICHAEL

Category/Reason for Placement in Security Detention *[√ any of the following that apply]:*
- ☐ Current Escape Risk;
- ☒ Threat to the physical safety of others and/or the order and security of the facility; and/or
- ☐ Confirmed member of a security threat group (STG)

Type of hearing *(√ appropriate one):*  ☐ 60-day hearing;     ☒ 180-day hearing;

Offender Notification  *[Read (at ➤) to the offender; do not provide a copy]:*

NOTE: Was a certified interpreter used?  ☐ Yes  ☒ N/A;  If 'yes', who was the interpreter? *(print name):* _____

➤ **"You will be scheduled for a RHC hearing during the week of** 12/18/2023 . **You have the right to attend the hearing, to make a statement, to submit written statements from witnesses, and to submit other documentary evidence."**

Offender was notified on: *12-14-23* at: *1628* ; by: Jackson                    CO4
            (Date)        (Time)      (Print Name)                (Rank/Title)

Offender Signature: Daniel D. Dillard ; Staff Signature _____

### II. HEARING

*Instructions: An SCC member (or designee) shall complete Section II to document the hearing and evidence presented or considered.*

Hearing Date/Time:  on 12/13/2023 at 11:30 ;

Was the offender present?  ☒ Yes  ☐ No; If no, provide the reason(s) (medical, mental health, safety, security concerns, or offender refused): _____

Was a certified interpreter used?  ☐ Yes  ☒ N/A;     If 'yes', who was the interpreter? *(print name):* _____

Was the offender excluded from the hearing during the taking of evidence?  Yes ☐  No ☒  If 'yes', provide the reason(s): _____

Offender's Statement: _____

Did the offender provide a written statement?  ☐ Yes  ☒ No;  *(If 'yes', it must be attached).*

If witness(es) were requested, were any or all excluded? ☐ Yes ☐ No ☒ N/A; If 'yes', provide the reason(s): _____

Witness statement: _____

If documentary evidence was presented, was it excluded?  ☐ Yes  ☐ No  ☒ N/A;  *(Note: Attach documentary evidence, even if excluded.)*
If 'yes', provide the reason(s): _____

Interview with Offender:
- Disciplinary Violations: Sulla
- Medical Services Requested: OK
- Offender/Staff Interaction: OK OK
- Program Participation: WS
- Psychiatric Services Requested: NC
- Offender Request: W to R/P
- Other: _____

I-189; pg. 1 of 2 (8/2019 )    CANARY Classification & Records    WHITE: offender's unit file    PINK: offender

## TEXAS DEPARTMENT OF CRIMINAL JUSTICE
### State Classification Committee (SCC)
*Security Detention Review Hearing Record*

### III. COMMITTEE DECISION

*Instructions:* The SCC designee shall complete Section III to document the SCC's decision and the basis for the decision.

**SUMMARY of the basis for the SCC's decision:**

| | |
|---|---|
| ☐ Escape Risk (ES) | ☐ Riot Participation |
| ☐ History of Multiple Assaults | ☐ Extortion Activity |
| ☐ Offender Assaultive | ☐ Sexually Assaultive |
| ☑ Staff Assaultive (SA) | ☐ Serious Bodily Injury |
| ☐ Hostage Taker (HS) | ☐ Confirmed STG _____ |
| ☐ Defeats Restraints (SR) | ☑ Multiple Administrative Segregation Placements |
| ☐ Weapons Possession (WP) | ☐ Unresolved Felony Charges (pertaining to current security detention status) |

☐ Other *(Specify):* _____ SRTF _____

_____

**DISPOSITION** -- The offender shall (√ one):

☑ Remain on current status until _Dec 2024_ .

☐ Promote to: _____

☐ Be released to general population *(Note recommended custody* _____ *)*

➤ By transfer? ☐ Yes; ☐ No;   If 'yes', note the unit: _____

**SPECIAL CONDITIONS OR RESTRICTIONS** required for security purposes: _____

_____

**REFERRALS** (√ *if any*): ☐ Medical Department; ☐ Behavioral Health; ☐ STG Officer; ☐ Other *(Specify):* _____

Attended by the following staff (*Print name and rank or title and sign initials below*): A. Thompson, SCC, at
_____ *(SCC Representative)**

_Donalus Skeggs Major_ DS and _J Brown PSIII_ JB
*(Warden or designee)*       *(Name/Rank of other staff, as deemed appropriate)*

➤ * Was the SCC representative connected via telephone? ☐ Yes; ☑ No

### IV. OFFENDER NOTIFICATION OF DECISION

*Instructions:* Correctional staff making the notification to the offender shall complete this section and, provide the offender (either in person or via truck mail) the "pink" copy of this completed hearing record. If the offender is not present at the hearing, the correctional staff making the notification will generally complete this section with only the "canary" and "pink" copies of the form the SCC will keep the original following the hearing.

Offender Notified by: _J Brown PSIII_
*(Print Name & Rank/Title)*

Staff Signature/Date: _J Brown 12/19/23_

**I-189; pg. 2 of 2 (8/2019)**      CANARY: Classification & Records      WHITE: offender's unit file      PINK: offender

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

*Security Detention Level Review/Placement on Restriction*

FYD

Offender Name: _Dillard, Daniel_ ; TDCJ Number: _1400285_; Custody: _1A_ ; Unit: _Michael_

---

*Instructions:  The highest-ranking security supervisor on duty has the authority to initially place an offender on restriction.  The shift supervisor (may be the same individual) shall document the placement in Sections I. and II. of this form; and then notify the unit classification committee (UCC) or the restrictive housing committee (RHC) by providing them this form intact.*

As of *(date)* _____, at *(time)* _____, the above-named offender has been placed on restriction, in accordance with SM-01.29, "*Offender Management Restrictions.*"  [NOTE:  Place a √ in front of each restriction imposed]:

___ **Paper gown;**          ___ **Paper mask;**          ___ **Food loaf**
___ **Personal property** (*i.e., container; hard plastic; lock; metal; hotpot; etc.*)
   • List specific property restricted: _____

___ State-Issued property (*i.e., mattress; blanket; sheet; etc.*)
   • List specific property restricted: _____

Reason for placement: _____
_____

Documented by: _____  _____  _____  _____
                    *(Print Name)*              *(Rank and Title)*         *(Signature)*           *(Date)*

➔ *The restriction(s) may only continue up to 24 hours without review by the UCC/RHC (or until their earliest following workday).*

---

*Instructions:  This section shall be used for both UCC and RHC reviews.  If the form is being used for a *subsequent review, the RHC must ensure Section I (Offender Information) is completed and the previous I-203 is available for review.*

REVIEW: (√ one) ☐ Initial; ☒ *Subsequent;     Review held on _11-28 23_ at _0834_ by the (√ one) ☐ UCC; ☒ RHC.
                                                          *(Date)*      *(Time)*

**Type of Review:**  ☐ **Restriction;**     ☐ **7-day;**     ☒ **30-day;**     ☐ **Special Review;**

**RESTRICTIONS:**  The UCC/RHC has reviewed the offender's record and has decided to either impose, continue, or discontinue restrictions, as noted below:

- Paper gown?          ☐ YES; ☐ NO      Review/Expiration Date: _____
- Food loaf?           ☐ YES; ☐ NO      Review/Expiration Date: _____
- Personal property?   ☐ YES; ☐ NO      Review/Expiration Date: _____
   • List specific property restricted: _____
- State-Issued property?   ☐ YES; ☐ NO   Review/Expiration Date: _____
   • List specific property restricted: _____

**LEVEL:** ☐ I;     ☐ II; or     ☐ III
Justification for decision(s):  _Remain_ _____
_____
_____

Committee Members (*Print name and rank or title*): _____
_____ ; and _____

---

*Instructions:  Correctional staff shall notify the offender that the UCC/RHC decision will expire on the date indicated or be reviewed for continuation, request the offender to sign (if the offender refuses, document the refusal), and provide the offender a copy of the completed document.*

Notified by: _Barbara Cox BC_          _11-29-23  1106_    _unable to sign_
            *(Employee -- print name and sign initials)*    *(Date and Time)*    *(Offender signature and date)*

---

**I-203** (8/2019)          WHITE:  offender's unit file          CANARY:  offender

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

*Security Detention Level Review/Placement on Restriction*

C15

Offender Name: Dillard, Daniel ___; TDCJ Number: 1400285; Custody: 1A ; Unit: Michael

**Instructions:**  The highest-ranking security supervisor on duty has the authority to initially place an offender on restriction.  The shift supervisor (may be the same individual) shall document the placement in Sections I. and II. of this form; and then notify the unit classification committee (UCC) or the restrictive housing committee (RHC) by providing them this form intact.

As of *(date)* _____, at *(time)* _____, the above-named offender has been placed on restriction, in accordance with SM-01.29, *"Offender Management Restrictions."*  [NOTE:  Place a √ in front of each restriction imposed]:

___ **Paper gown;**    ___ **Paper mask;**    ___ **Food loaf**
___ **Personal property** *(i.e., container; hard plastic; lock; metal; hotpot; etc.)*
  • List specific property restricted: _____

___ State-Issued property *(i.e., mattress; blanket; sheet; etc.)*
  • List specific property restricted: _____

Reason for placement: _____

_____

Documented by: _____ _____ _____ _____
                (Print Name)              (Rank and Title)         (Signature)           (Date)

➔ *The restriction(s) may only continue up to 24 hours without review by the UCC/RHC (or until their earliest following workday).*

**Instructions:**  This section shall be used for both UCC and RHC reviews.  If the form is being used for a *subsequent review, the RHC must ensure Section I (Offender Information) is completed and the previous I-203 is available for review.

REVIEW: (√ one) ☐ Initial;  ☒ *Subsequent;      Review held on 10-30-23 at 0839 by the (√ one) ☐ UCC; ☒ RHC.
                                                    *(Date)*  *(Time)*

**Type of Review:**  ☐ **Restriction;**    ☐ **7-day;**    ☒ **30-day;**    ☐ **Special Review;**

**RESTRICTIONS:**  The UCC/RHC has reviewed the offender's record and has decided to either impose, continue, or discontinue restrictions, as noted below:

- Paper gown?          ☐ YES; ☐ NO       Review/Expiration Date: __ _____
- Food loaf?           ☐ YES; ☐ NO       Review/Expiration Date: _____
- Personal property?   ☐ YES; ☐ NO       Review/Expiration Date: _____
  • List specific property restricted: _____
- State-Issued property?  ☐ YES; ☐ NO    Review/Expiration Date: _____
  • List specific property restricted: _____

**LEVEL:** ☐ I;    ☐ II; or    ☐ III

Justification for decision(s): Remain _____

_____

_____

Committee Members *(Print name and rank or title):* _____
Dillon LT _____ ; and _____ Hicks Sgt _____

**Instructions:**  Correctional staff shall notify the offender that the UCC/RHC decision will expire on the date indicated or be reviewed for continuation, request the offender to sign (if the offender refuses, document the refusal), and provide the offender a copy of the completed document.

Notified by: Barbara Cox  BC   10-31-23 1056   Unable to Sign
          *(Employee -- print name and sign initials)*   *(Date and Time)*   *(Offender signature and date)*

I-203 (8/2019)          WHITE:  offender's unit file          CANARY:  offender

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

*Security Detention Level Review/Placement on Restriction*

C15

Offender Name: Dillard, Daniel ; TDCJ Number: 1400285; Custody: 1A ; Unit: Michael

*Instructions: The highest-ranking security supervisor on duty has the authority to initially place an offender on restriction. The shift supervisor (may be the same individual) shall document the placement in Sections I. and II. of this form; and then notify the unit classification committee (UCC) or the restrictive housing committee (RHC) by providing them this form intact.*

As of *(date)* _____, *at (time)* _____, the above-named offender has been placed on restriction, in accordance with SM-01.29, *"Offender Management Restrictions." [NOTE: Place a √ in front of each restriction imposed]:*
___ **Paper gown;**      ___ **Paper mask;**      ___ **Food loaf**
___ **Personal property** *(i.e., container; hard plastic; lock; metal; hotpot; etc.)*
   • *List specific property restricted:* _____

___ State-Issued property *(i.e., mattress; blanket; sheet; etc.)*
   • *List specific property restricted:* _____

Reason for placement: _____
_____

Documented by: _____ _____ _____ _____
                    *(Print Name)*              *(Rank and Title)*          *(Signature)*              *(Date)*

➔ *The restriction(s) may only continue up to 24 hours without review by the UCC/RHC (or until their earliest following workday).*

*Instructions: This section shall be used for both UCC and RHC reviews. If the form is being used for a *subsequent review, the RHC must ensure Section I (Offender Information) is completed and the previous I-203 is available for review.*

REVIEW: *(√ one)* ☐ Initial; ☒ *Subsequent;      Review held on 9-28-23 at 0851 by the *(√ one)* ☐ UCC; ☒ RHC.
                                                    *(Date)*        *(Time)*

**Type of Review:** ☐ **Restriction;**      ☐ **7-day;**      ☒ **30-day;**      ☐ **Special Review;**

**RESTRICTIONS:** The UCC/RHC has reviewed the offender's record and has decided to either impose, continue, or discontinue restrictions, as noted below:

- Paper gown?              ☐ YES; ☐ NO      Review/Expiration Date: _____
- Food loaf?               ☐ YES; ☐ NO      Review/Expiration Date: _____
- Personal property?       ☐ YES; ☐ NO      Review/Expiration Date: _____
   • *List specific property restricted:* _____
- State-Issued property?   ☐ YES; ☐ NO      Review/Expiration Date: _____
   • *List specific property restricted:* _____

**LEVEL:** ☐ I;      ☐ II; or      ☐ III

Justification for decision(s):  Remain _____
_____
_____

Committee Members *(Print name and rank or title):* _____
_____ ; and  D. Cox _____

*Instructions: Correctional staff shall notify the offender that the UCC/RHC decision will expire on the date indicated or be reviewed for continuation, request the offender to sign (if the offender refuses, document the refusal), and provide the offender a copy of the completed document.*

Notified by: Barbara Cox  BC      10-2-23 1328      Unable to sign
            *(Employee -- print name and sign initials)*      *(Date and Time)*      *(Offender signature and date)*

I-203 (8/2019)              WHITE: offender's unit file              CANARY: offender

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

*Security Detention Level Review/Placement on Restriction*

C 15

Offender Name: _Dillard, Daniel_ ; TDCJ Number: _1400285_ ; Custody: _1A_ ; Unit: _Michael_

**Instructions:** The highest-ranking security supervisor on duty has the authority to initially place an offender on restriction. The shift supervisor (may be the same individual) shall document the placement in Sections I. and II. of this form; and then notify the unit classification committee (UCC) or the restrictive housing committee (RHC) by providing them this form intact.

As of (date) _____, at (time) _____, the above-named offender has been placed on restriction, in accordance with SM-01.29, "*Offender Management Restrictions.*"  [NOTE: Place a √ in front of each restriction imposed]:

___ **Paper gown;**      ___ **Paper mask;**      ___ **Food loaf**
___ **Personal property** (*i.e., container; hard plastic; lock; metal; hotpot; etc.*)
   • List specific property restricted: _____
___ State-Issued property (*i.e., mattress; blanket; sheet; etc.*)
   • List specific property restricted: _____

Reason for placement: _____
_____

Documented by: _____ _____ _____ _____
                        (Print Name)              (Rank and Title)              (Signature)              (Date)

➔ The restriction(s) may only continue up to 24 hours without review by the UCC/RHC (or until their earliest following workday).

**Instructions:** This section shall be used for both UCC and RHC reviews. If the form is being used for a *subsequent review, the RHC must ensure Section I (Offender Information) is completed and the previous I-203 is available for review.

REVIEW: (√ one) ☐ Initial; ☒ *Subsequent;     Review held on _8-22-23_ at _0921_ by the (√ one) ☐ UCC; ☒ RHC.
                                                         (Date)    (Time)

**Type of Review:** ☐ **Restriction;**    ☐ **7-day;**    ☒ **30-day;**    ☐ **Special Review;**

**RESTRICTIONS:** The UCC/RHC has reviewed the offender's record and has decided to either impose, continue, or discontinue restrictions, as noted below:

- Paper gown?          ☐ YES; ☐ NO      Review/Expiration Date: _____
- Food loaf?            ☐ YES; ☐ NO      Review/Expiration Date: _____
- Personal property?    ☐ YES; ☐ NO      Review/Expiration Date: _____
   • List specific property restricted: _____
- State-Issued property? ☐ YES; ☐ NO     Review/Expiration Date: _____
   • List specific property restricted: _____

**LEVEL:** ☐ I;    ☐ II; or    ☐ III

Justification for decision(s): _Remain_____
_____
_____

Committee Members (Print name and rank or title): _____
_____ ; and _____

**Instructions:** Correctional staff shall notify the offender that the UCC/RHC decision will expire on the date indicated or be reviewed for continuation, request the offender to sign (if the offender refuses, document the refusal), and provide the offender a copy of the completed document.

Notified by: _Barbara Cox      DC_      _8-30-23  0813_      _unable to sign_
             (Employee -- print name and sign initials)    (Date and Time)    (Offender signature and date)

I-203 (8/2019)              WHITE: offender's unit file              CANARY: offender

EXHIBIT- G



$7.75
$4.62
$3.13

RETURNED FOR
ADD'L POSTAGE
$3.13
WHEN REMAILING CROSS OUT THIS
NOTICE OR PASTE STAMPS OVER IT

Texas Department of Criminal Justice
Daniel Dillard # 01400285
P.O. Box 660400
Dallas, Texas 75266-0400

Daniel D. Dillard #01400285
Mark W. Michael - Prison
2664 F.M. 2054
Tennessee Colony, Texas 75886

12C 15

Michael Unit
+ Wslo yard
Not notified@
new unit's yet

EXHIBIT-H

# United States Court of Appeals
# for the Fifth Circuit

No. 22-10791
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

September 21, 2023

Lyle W. Cayce
Clerk

DANIEL D. DILLARD,

*Plaintiff—Appellee,*

*versus*

LORIE DAVIS, *Former Director, Texas Department of Criminal Justice;*
JIMMY S. SMITH, *Senior Warden;* ANDREA B. LOZADA, *Former
Assistant Warden;* ELBERT G. HOLMES, *Former Assistant Warden;*
CODY S. MILLER, *Captain;* BRYAN D. REITSMA, *Former Captain;*
SHON MCGEE, *Lieutenant;* GREGORY S. FREDRICKS; DAKOTA R.
DENNEY; JAYTON W. CHAVERS; JAMES BULLARD; TIMOTHY
WASHINGTON, *Major;* BOBBY LUMPKIN, *Director, Texas Department of
Criminal Justice, Correctional Institutions Division,*

*Defendants—Appellants.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:19-CV-81

Before SMITH, HIGGINSON, and ENGELHARDT, *Circuit Judges.*
PER CURIAM:[*]

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 22-10791

Daniel D. Dillard, Texas prisoner # 1400285, filed a 42 U.S.C. § 1983 suit challenging a prison disciplinary conviction and his prolonged confinement in restrictive housing.  The district court denied Dillard's motion for partial summary judgment, granted the defendants' motion for summary judgment as to several claims, denied the defendants' motion for summary judgment based on qualified immunity and *Heck v. Humphrey*, 512 U.S. 477 (1994), and entered a partial final judgment.  Dillard and the defendants appealed the district court's order and judgment.  Dillard also filed a postjudgment motion for reconsideration in accordance with Federal Rule of Civil Procedure 59(e).  Dillard subsequently moved to dismiss his appeal to allow the district court to rule on his pending motion for reconsideration.  We granted the motion.  Dillard now moves to remand the case to the district court and dismiss the defendants' appeal for lack of jurisdiction due to the pending motion for reconsideration.

A timely "notice of appeal in a civil case is a jurisdictional requirement." *Bowles v. Russell*, 551 U.S. 205, 214 (2007).  Here, Dillard filed a motion for reconsideration which challenged the correctness of the district court's order and partial final judgment. *See* Fed. R. Civ. P. 59(e).  Such a pleading is commonly construed as a Rule 59(e) motion if, as here, it was filed within the applicable 28-day time limit. *See Mangieri v. Clifton*, 29 F.3d 1012, 1015 n.5 (5th Cir. 1994) (applying the former 10-day time limit for filing a Rule 59(e) motion).

Under Federal Rule of Appellate Procedure 4, the filing of certain postjudgment motions, including a timely Rule 59(e) motion, renders a notice of appeal ineffective until an order is entered disposing of the motion. Fed. R. App. P. 4(a)(4)(A)(iv), (B)(i); *see also Simmons v. Reliance Standard Life Ins. Co. of Tex.*, 310 F.3d 865, 868 (5th Cir. 2002).  Because the district court has not ruled on Dillard's Rule 59(e) motion, the defendants' notice of appeal is not yet effective, and this appeal is premature. *See* Fed.

2

No. 22-10791

R. App. P. 4(a)(4)(B)(i); *Burt v. Ware*, 14 F.3d 256, 260-61 (5th Cir. 1994). Accordingly, Dillard's motion to remand is GRANTED, and this case is REMANDED for the limited purpose of allowing the district court to rule on the Rule 59(e) motion. We hold the appeal in abeyance until the notice of appeal becomes effective, and we retain jurisdiction over the appeal except for the purposes of the limited remand. The clerk of this court is instructed to process the appeal immediately upon the return of the case from the district court.

MOTION GRANTED; LIMITED REMAND; APPEAL HELD IN ABEYANCE.

EXHIBIT-I

EXHIBIT-J

74,764

TFSTMT

INMATE TRUST FUND
STATEMENT OF ACCOUNTS
P.O. BOX 60
HUNTSVILLE, TEXAS 77342-0060

LOCATION: 12-F-C ROW-2   4 UNIT: | MI

NAME: DILLARD, DANIEL DENARD

ACCOUNT
DATE: 11/30/23   NUMBER: 01400285

74,764 MEDICAL CO-PAY OWED: 284.60

FEDERAL COURT FEE OWED: 834.00

TEXAS COURT FEE/CHARGE OWED: .00

INDIGENT SUP OWED 77.31   OTHER HOLD AMOUNT: .00   BEGINNING BALANCE:

| DATE | ITEM/DESCRIPTION | | WITHDRAWALS | DEPOSITS | BALANCE |
|------|------|------|------|------|------|
| 11/23 | | | | | |
| 16 | AB 000000 000184 | POSTAGE | .00 | | .00 |
| 20 | AB 000000 000263 | POSTAGE | .00 | | .00 |



Daniel D. Dillard #01102220
Mark W. Michael Prison
2664 F.M. 2054
Tennessee Colony, Texas 75886

LEGAL MAIL
Legal Mail
2 of 2

United States District Court
Office of the Clerk
Northern District of Texas
501 West Tenth st., Room 310
Fort Worth, Texas 76102

14



FROM: Daniel D. Dillard #01400285
Mark W. Michael Prison
2664 F.M. 2054
Tennessee Colony, Texas 75886

TO:
United States District Court
Office of the Clerk
Northern District of Texas
501 West Tenth St., Room 310
Fort Worth, Texas 76102

PRESS FIRMLY TO SEAL

Retail

U.S. POSTAGE PAID
PM
PALESTINE, TX 75803
JAN 12, 2024
$0.00
R2304M112853-03

VISIT US AT USPS.COM
ORDER FREE SUPPLIES ONLINE

UNITED STATES
POSTAL SERVICE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14L © U.S. Postal Service; February 2014; All rights reserved.